[No. G041897. Fourth Dist., Div. Three. Aug. 25, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
BAHRAM NAZERI, Defendant and Appellant.

**COUNSEL**

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Ronald Jakob and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

Bahram Nazeri was contemplating suicide on Tuesday night, August 22, 2006. He was in the company of his two brothers, Yadi and Shawn, at his own home in northern Irvine. One of the brothers decided to call the Irvine Police Department. When officers arrived, Bahram grabbed something from the kitchen and went into the backyard. Bahram told the officers he had a gun. There was a standoff. Bahram surrendered after an hour. He had no gun, but he had cut his wrists and there was blood on his face and hands.

When the police searched the house, they found the bodies of Bahram's wife and mother-in-law in the shower of a locked downstairs bathroom. Two nights before, each had been stabbed more than 20 times.

Bahram admitted he had done the killings. He was subsequently convicted of two counts of first degree murder and sentenced to life imprisonment without possibility of parole.

■ The sole issue presented in this appeal is whether there was sufficient evidence to sustain his convictions for *first* degree murder—that is, murder that requires deliberation and premeditation—in regard to both victims. We affirm, because the evidence was susceptible of this reasonable inference: Bahram, believing his wife to be unfaithful, perceiving himself to have been mocked by his mother-in-law, and afraid that both wife and mother-in-law were plotting to kill him, took a beautiful ornamental knife normally kept in the upstairs bedroom, and went down the stairs with it, specifically intending to kill both women.

## II. THE EVIDENCE

### A. Manner of Killing

#### 1. *Bahram's Account of the Stabbings*

This case is rather remarkable in that defendant Bahram Nazeri took the stand in his own defense and told his own version of the killings of his late wife Nooshin Khaneh and his late mother-in-law, Parvane Ghararyankordestan. We will refer to all three of them by their first names: Bahram, Nooshin and Parvane respectively. (As in family law opinions, no disrespect is intended.) The main point of Bahram's testimony was that he killed in self-defense: "They came to me with the knife and I defend myself."

We will begin, then, with Bahram's own account of the killings, as told on direct examination in his defense:

It was Saturday, August 19, 2006. Bahram and Nooshin were living in their home in Irvine with their two daughters and Nooshin's mother Parvane. Bahram played with his two daughters in the swimming pool that afternoon. Later that afternoon or early evening, Bahram told Nooshin he was going out for a run, but she said, "no, don't go," because she was going out shopping with her mother. He scrubbed the run and complied.

The two didn't come back until after 9:00 p.m. that evening, after the children's bedtime. Nooshin went upstairs to sleep, Parvane downstairs. Bahram and Nooshin then had, in his words, "wild, wild sex." The couple intended to go to sleep, but soon smelled smoke.

By this time, Parvane had gone to her room. Nooshin said that Parvane was awake and "not sleeping," and told Bahram she would go and talk to her mother. Nooshin went downstairs, wearing a towel. Bahram said, "Okay. I'm

going to sleep." Instead, he was "curious," and soon found himself outside of the house listening to the conversation his wife and mother were having inside.

Nooshin told Parvane, "I talked to Farokh today." Then, referring to Bahram, she said: "Mommy, don't worry. Less than two weeks, he will be finished. Less than two weeks."

Bahram brushed into some bushes. Nooshin saw the movement of the bushes and screamed. Bahram then came into the house. The next thing, according to his testimony, was that he grabbed Nooshin. And as he grabbed her, the towel came off and she grabbed a knife.

Bahram tried to get the knife from Nooshin's hand. "You want to kill me? You want to kill me?" he exclaimed. As he tried to get the knife from Nooshin, Parvane intervened and began "hitting [him] from behind."

The next thing Bahram knew, "all over is blood" and he was "between" the two women. The only thing he remembered after that was the thought he needed to "take myself, too."

Cross-examination yielded this exchange as to how, precisely, Nooshin obtained the knife. (Readers should bear in mind that English is Bahram's third language, the first two being Farsi and Kurdish):

"Q. So, as you grab the towel and she's facing away from you, you're still unaware that she has the knife?

"A. She grabbed it the way she run. The way when she run to the kitchen, she—*the knife was on top of the counter. She grabbed the knife.* Said, 'Get away from me. Get away from me.'

"Q. Oh, so you saw her grab the knife?

"A. Yeah, she grabbed it. And that's why I catch her. She left the—

"Q. Why did you chase her if she had a knife?

"A. To get it from her to say, 'Why do you want to kill me? Why you planning it?' " (Italics added.)

In short, his story was: When he interrupted the conversation between his wife and her mother, Nooshin ran into the kitchen where the knife was on the counter and grabbed it, he continued to chase her, then disarmed her. The next thing he knew, he had stabbed both her and her mother.

### 2. *The Knife*

#### a. Where?

Where, precisely, was the knife *ordinarily* kept? Ordinarily, said Bahram, it was located *in the bedroom.*

How did the knife get to the kitchen, where Bahram said Nooshin would eventually grab it from off the counter as he pursued her, then turn on him?

On cross-examination Bahram said that Nooshin took it downstairs to show her mother early Saturday morning.

When officers came to the house two mornings later, they found the knife in a cabinet underneath the kitchen sink.

#### b. What and How?

As mentioned, Bahram said the knife was, at least ordinarily, "located" in "my bedroom." That made sense, the knife was hardly the sort of artifact one would normally keep alongside the dishwashing soap and the cleansers beneath a kitchen sink.

It was, in fact, something of an objet d'art. In his direct testimony, Bahram described the knife as "beautiful designed, so we located in my bedroom, our bedroom." Then he recounted how Nooshin had said—apparently upon its acquisition at a swap meet—"It's beautiful"—and exclaimed how she wanted to take it back to Iran.

Bahram's testimony as found in the reporter's transcript shows the knife itself to be remarkable. It was a two-bladed knife that could easily be mistaken for a three-bladed knife, as there is an object with a "pointy edge" in the middle. The blades also fold, locking into one of two positions (either straight or "C" shaped).

Sometimes, for purposes of description—remember the jury actually got to view the knife (it was admitted into evidence as exhibit 62)—it is actually important for an appellate court to view what the jury saw. Bahram's

description, though accurate as far as it went, did not do the knife justice. And if, as Bahram testified, he really only spent $8 on it at a swap meet, he got a real bargain.

Here is what it looks like, as it rests in the box containing it as an exhibit:

For the benefit of readers who may not have access to the picture (or to a picture in color), we offer this description: Think of two griffin figures, facing away from each other, sharing a bronzish-looking body around four to five inches. That body was clearly intended to function as a handle. A small red glass, the size of a large pinhead, is in each eye of each griffin's head. Each of the two heads is about an inch in size. In the middle of the body there is a carved face with two pink pieces of glass forming the eyes of the face. The bottom of the body (where the stomachs of each griffin might be) is shaped into a sort of weird smile, and from the chin of the face comes a long "pointy" edged object an inch and one-half in length. The pointy-edged protrusion consists of a flat shaft, maybe a quarter-inch wide and half an inch downward, then another half-inch downward grows out into the form of a diamond. The diamond obviously functions to protect one's knuckles as one holds the knife, and at the same time secure one's grip. In the center of the diamond is another large pinhead-sized piece of red glass matching the eyes of the two griffins.

The two blades protrude from each griffin's breast, about equidistant from each griffin's face and claws. The two blades are about five inches in length, the sharp edges starting about three-fourths of an inch from where the blades emerge from each breast, then forming into a slight curve, scimitar-style, thus ending in a sharp point. The cutting edge of each blade faces downward, in

the same direction as the claws. There is a circular button, maybe half an inch in diameter, on the side of each griffin's breast. The button controls the choice of direction for each blade. That is, a blade either goes straight out of the griffin's breast, or can have the blade point down, parallel to the pointy shaft.

Given its design, there is really only one way to hold the knife: Put one's fingers and hand around the body, so that the pointy shaft ending in the diamond is between each of two fingers. To use the knife as any kind of effective weapon, though, one would have to have at least one of blades going straight out of a griffin's breast, so that one's hand formed a fist, gripping the body-shaped handle. With such a grip, one could raise one of the blades of the knife so as to use it in an overhead, or underhand, stabbing motion.

We have gone into such a detailed description of the knife because Bahram testified that Nooshin initially grabbed the knife, then he disarmed her of it. In fact, on cross-examination, Bahram said that he was able to *easily* grab the knife from Nooshin's hand. What's more, he was able to do it without cutting his own hand at all.

He wasn't able, however, to explain how he accomplished the transfer so readily and without cutting himself—all he did was refer to his original acquisition. To quote the relevant portion of transcript:

"Q. What part of this [(the prosecutor was referring to the knife)] did you grab if there were three blades pointing to you.

"A. The knife. I bought it.

"Q. It didn't cut your hand at all?

"A. No."

Bahram then went on to admit that he "immediately" stabbed Nooshin upon removing the knife from her.

c. Nature of the Wounds

The officer who discovered the bodies found two female bodies on top of each other in a bathtub with a shower. Nooshin was found holding human hair in her hand. Garbage bags filled with ice were next to them. A contract

coroner and forensic pathologist testified that both victims bled to death. While the coroner could not give a definite sequence of the wounds, Parvane was found with nine separate wounds around the neck. There were fatal wounds to Parvane to the back of her neck, as well as to her lungs, heart and chest. She also incurred "defensive" wounds to her right forearm. One wound penetrated the tissue around the eye and actually penetrated the eyeball.

As to Nooshin, she was stabbed numerous times around the head and neck, including the carotid artery, the jugular vein, the back of the neck in the same place as Parvane had been stabbed, plus wounds to her lung, diaphragm and stomach, all fatal. There were at least two "defensive" wounds to her left elbow and hand.

### B. Preexisting Motive Evidence

Largely because Bahram took the stand in his own defense, this case contains an unusual amount of evidence on motive. We emphasize that in recounting this evidence—particularly evidence that gives an unfavorable impression of the victims—we track Bahram's own testimony, much of which centered on reasons he proffered as to why Nooshin and Parvane wanted to kill him. The evidence may be sorted into four categories:

First, sex. In the summer of 2006, Nooshin visited Iran. Bahram could not go with her—his identification with the prerevolutionary regime would have subjected him to immediate arrest. He had suspicions of his wife's fidelity, and his brother Shawn advised him, after her return around August, how to obtain equipment to tap the household telephone. He obtained such equipment from Fry's and began tapping the phone and taping his wife's conversations. The taped conversations, of which transcripts in English are part of our record, led Bahram to believe that Nooshin was having an affair with someone in Iran named Farokh. (His name for her was "Kitty Kat.") Bahram told the jury that one reference in the tapes to a "fun race" was to an "unbelievable" three hours of sex that Nooshin and Farokh had together.

Second, money. Prior to the summer 2006 Iranian trip, Nooshin pestered Bahram to increase the amount of life insurance on his life. She wanted him to increase the amount from $1 million to $2 million. He decided against the idea while she was out on vacation, but he also acknowledged that he already had half a million dollars of life insurance *on her.*

Third, fear. One of the tapes that Bahram listened to between Nooshin and her paramour Farokh made a reference to "plots" or "plans" by Nooshin against Bahram. The message from Farokh was: Act normally, don't let on

that you have any plots or plans for him.[1] Nooshin also told Farokh how she had told him that when she returned to the United States, one of the "things" she had "to do" was to get Bahram to increase his life insurance. Bahram also told his newly divorced brother Shawn that he feared both Nooshin and Parvane wanted to kill him for his life insurance. Bahram himself opined that it is "common in Iran" to poison husbands for the life insurance. In fact, he said that Nooshin had let on to him that in Iran there is a "medicine" that is apparently used as a poison to induce heart attacks.

Fourth, humiliation. Bahram recounted the poignant story of his meeting Nooshin and Parvane at the airport after their recent trip to Iran. There he was, waiting with two dozen very beautiful roses for both ladies, with toys for the children, and a limousine to take the family home. And the first thing that Nooshin wanted to talk about was—whether he had complied with her request to increase the amount of insurance on his life. He also learned directly, from a taped conversation between Parvane and Nooshin's sister Nargess, what his mother-in-law thought of him: "You don't know what kind of scorpion he is." He was a man "busy with his own misery," who had "become so miserable and low." Parvane was also not impressed with Bahram's recent hair transplant operation; his head was "all stitched up and bumpy under the hair." And she was apparently laughing in a mocking tone when she said so.[2]

## C. Pre-August 19 Planning Activity

Bahram's nephew Dan (son of Bahram's brother Shawn) testified that, about six days before the stabbings he overheard his father and Bahram talking in Kurdish on Shawn's patio, and in the conversation Bahram said (in Dan's words) "he's going to kill Nooshin."

Bahram himself admitted on cross-examination that he had his own plan, "not to kill her" but to divorce her and leave her with "no money."[3]

---

[1] Exact quote translated from the Farsi: "Let it be proven to him you are living a normal life. God forbid, you don't have any plans or plots for him."

[2] "Q. You were glad to have your mother-in-law laughing about your hair transplants?

"A. Well, that's what you do everything for somebody and they will laugh at you."

[3] Apparently the idea was to liquidate all the family wealth and hide it; either that, or Bahram didn't know anything of California divorce law. Here's his testimony verbatim: "I had a plan. Not to kill her. I had a plan to finally broke her and then leave there. That's why we decided to refinance the home, and take all the 300,000 dollars and whatever car and truck we have, sell and take everything. Financially broke her. And then divorce her. And get my kids."

## III. DISCUSSION

### A. Standard of Review

We pause for a moment to note how the substantial evidence standard of review plays out in a case such as this. Our task is not to determine, for example, whether the *weight* of the evidence might favor second degree murder over first degree murder for either or both victims. Our task is to determine whether there was *sufficient* evidence by which a rational jury could decide that both victims were the objects of first degree murder.

■ The statutory definition of all murder is "the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) First degree murder is any "kind of willful, deliberate, and premeditated killing." (Pen. Code, § 189.) Second degree murder is any kind of murder that doesn't fall within the definition of first degree murder.[4] That is, the key words are "willful, deliberate and premeditated," which are generally treated under the rubric of "premeditation and deliberation." If a rational jury *could* have come to the conclusion that both these killings were willful, deliberate and premeditated, then we must affirm even if, had we been members of the jury, we would not have so concluded.

### B. Three Common Categories Used for Appellate Review

■ In *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], our Supreme Court distilled three basic "categories" of evidence for analyzing premeditation and deliberation. These categories are planning activity, motive, and manner of killing. (See *id.* at p. 27.) *Anderson* was the first case to analyze first degree murder by analyzing these three categories of

---

[4] Here is the complete text of Penal Code section 189:

"All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree.

"As used in this section, 'destructive device' means any destructive device as defined in Section 12301, and 'explosive' means any explosive as defined in Section 12000 of the Health and Safety Code.

"As used in this section, 'weapon of mass destruction' means any item defined in Section 11417.

"To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act."

evidence, which the court developed as a gloss on the previous case of *People v. Thomas* (1945) 25 Cal.2d 880, 898, 900, 901 [156 P.2d 7]. (See *Anderson, supra*, 70 Cal.2d at pp. 26–27 ["The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing— what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People v. Thomas, supra*, 25 Cal.2d 880, at pp. 898, 900, 901); (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (italics omitted)].)

■ In our Supreme Court's most recent iteration on the topic, the court had occasion to point out that the three categories provide *"one framework* for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation." (*People v. Solomon* (2010) 49 Cal.4th 792, 812 [112 Cal.Rptr.3d 244, 234 P.3d 501], italics added (*Solomon*).)[5]

The high court has further cautioned that the *Anderson* categories are only a set of "guidelines" for analysis. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32 [47 Cal.Rptr.2d 843, 906 P.2d 1129] (*Sanchez*) ["We have recently explained that the *Anderson* factors do not establish normative rules, but instead provide guidelines for our analysis."].)[6]

---

[5] The basic passage is: "Drawing on these three categories of evidence, *Anderson* provided one framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. In so doing, *Anderson*'s goal 'was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*Solomon, supra*, 49 Cal.4th at p. 812.)

[6] Legal researchers take note: A red flag or red pennant by a case does *not* mean "don't bother to read." *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22 [87 Cal.Rptr.3d 209, 198 P.3d 11] had occasion to overrule *Sanchez* (and a great number of other cases) on the (for our purposes here) arcane and irrelevant point of the correct standard to use to ascertain whether a criminal defense lawyer has a conflict of interest for purposes of ineffective assistance of counsel analysis. But, judging by, say, the number of headnotes that at least one commercial headnote writer has distilled from *Sanchez*, the case stands as good law for a

In particular, the court has emphasized that the three categories themselves do not constitute a substitute for, or a rewriting of, the actual elements of first degree murder. (*People v. Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101] (*Thomas*) ["Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way."].)

Rather, as stated in *People v. Prince* (2007) 40 Cal.4th 1179, 1253 [57 Cal.Rptr.3d 543, 156 P.3d 1015], " ' "these categories of evidence, borrowed from *People v. Anderson* . . . , 'are descriptive, not normative.' " ' " In fact, as the high court said in 2007: "Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts *need not accord them any particular weight.*" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420 [64 Cal.Rptr.3d 721, 165 P.3d 512], italics added.)

And in fact, in several recent cases, the Supreme Court has described the various *Anderson* categories in the disjunctive, inserting an "or" in the series, as if to emphasize that a first degree murder conviction may be upheld with evidence from any of the three categories: "First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly . . . and is evidenced by planning activity, a motive to kill, *or* an exacting manner of death." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [82 Cal.Rptr.3d 265, 190 P.3d 616], citation omitted, italics added.) And: "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, *or* when there is evidence of motive with evidence of either planning *or* manner." (*People v. Romero* (2008) 44 Cal.4th 386, 401 [79 Cal.Rptr.3d 334, 187 P.3d 56], italics added.)

We therefore may confidently articulate this synthesis of our high court's premeditation and deliberation jurisprudence vis-à-vis the *Anderson* categories: Those categories do not constitute some simplistic set of three elements, all of which must be present before a reviewing court may find sufficient evidence to uphold a first degree murder conviction.

---

minimum of at least 20 other discrete points, including, as we shall soon see, what it had to say about motivation in the context of premeditation and deliberation.

### C. The Extent of Reflection Test

Concomitantly, it is not surprising that the standard jury instruction defining deliberate and premeditated murder, is *not* framed in terms of the standard *Anderson* categories, but in terms of extent of reflection on the decision to kill.[7] (And, for what it is worth, the jury instructions in this case as orally given to the jury also did not mention any of the three *Anderson* categories, but focused on extent of reflection.[8])

Indeed, one of the Supreme Court's most recent discussions of premeditation and deliberation emphasizes the extent of *reflection* on the decision to kill. (See *Solomon, supra*, 49 Cal.4th at pp. 812–813 ["Defendant overlooks a core principle that has guided appellate courts in assessing the sufficiency of the evidence of premeditation and deliberation for over 60 years: 'The true test is not the duration of time as much as it is the extent of the reflection.' "].)

■ The *speed* by which such reflection takes place may not be as short as the flicker or twinkling of an eye (see *Solomon, supra*, 49 Cal.4th at p. 829 ["Contrary to defendant's assertion, the prosecutor did not suggest premeditation and deliberation could occur in the 'flick of an eye' rather than after 'careful thought and weighing of considerations.' "]). But premeditation and

---

[7] After defining "murder," "willful," "deliberate," and "premeditated," CALJIC No. 8.20 elaborates on premeditation and deliberation in its final four paragraphs. We set those forth now, to show just how much the instruction focuses on the idea of reflection:

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon *pre-existing reflection* and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be *pondered* before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

"*The true test is not the duration of time, but rather the extent of the reflection.* A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] [she] decides to and does kill." (*Ibid.*, italics added.)

[8] To quote the core of the instruction: "If you decide that the defendant has committed murder, you must decide whether it is murder of the first or second degree. The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. [¶] The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill. . . ."

There is no assertion in this appeal that the jury was in any way instructed incorrectly.

deliberation are present if the jury could find a sufficient extent of reflection on the decision to kill. (See *id.* at pp. 812–813.)

In ascertaining the sufficiency of reflection, we must of course be guided by what our high court has concluded in similar circumstances. In *People v. Perez* (1992) 2 Cal.4th 1117 [9 Cal.Rptr.2d 577, 831 P.2d 1159] (*Perez*),[9] there was sufficient evidence of premeditation and deliberation where the defendant's entering a house and obtaining a steak knife from a kitchen was held properly indicative of planning activity, even in the case of a brutal and frenzied knife attack. (If anything, the attack was more brutal and frenzied than the facts before us: The knife broke and the victim, a pregnant woman, was stabbed 38 times. (See *id.* at p. 1122.)) In *Thomas, supra,* 2 Cal.4th 489, the defendant's returning to his car to get a rifle and ammunition before committing the murders showed planning activity. (*Id.* at p. 517.) And in *People v. Lewis* (2009) 46 Cal.4th 1255 [96 Cal.Rptr.3d 512, 210 P.3d 1119] (*Lewis*) the court said the "additional act" of slashing the victim's throat *after* the victim had been "strangled to the point of unconsciousness" was " 'indicative of a reasoned decision to kill.' " (*Id.* at p. 1293.)

## D. Application

While the *Anderson* categories do not constitute a simple set of elements to be met before a first degree murder conviction may be upheld, it is remarkable how strong two of those categories, pre-event planning activity and motive, are in this case.

### 1. *Planning activity*

Indeed, the single most important item of evidence for purposes of this appeal is Bahram's testimony that the "beautiful" ornamental knife that turned out to be the murder weapon was *normally* kept in the upstairs bedroom. The jury, of course, did not have to believe Bahram's story that Nooshin had taken the knife from where it was normally kept in the upstairs bedroom and brought it down to the kitchen Saturday morning, August 19. Given the nature of the knife—an ornament, not a kitchen utensil—and the inference that it had not been so recently acquired as to compel Nooshin to bring it down to show off to her mother (there was no evidence of any trips to a swap meet that morning)—the jury could have reasonably concluded that the knife remained in the upstairs bedroom when Nooshin smelled smoke and got up ostensibly to check on her mother Parvane.

On top of that, the jury had a ready basis to disbelieve Bahram's assertion that Nooshin initially had the knife. According to his testimony, he was able

---

[9] The case came from this court. The high court reversed a majority judgment that held there was *insufficient* evidence of premeditation and deliberation.

to disarm her of it as she was fleeing from him. And disarm her without sustaining so much as a cut himself! That idea borders on the incredible. (And is one of the main reasons we take the unusual step of publishing a picture of the knife in this opinion: The "cold" transcript does not accurately portray *what the jury saw*.) The pointy shaft protrusion from the belly of the beast complete with diamond to secure one's grip makes it almost impossible to imagine how the knife could be easily dislodged from anyone's hand without the attacker suffering wounds. It is as if the knife were purposefully designed to be hard to take from anyone who got a grip around the body-shaped handle—particularly someone so intent on struggling for her life that she pulled out her assailant's hair with her bare hands.

*The point is, the knife was in Bahram's hands all along.*

The jury could also have reasonably inferred a few things about Bahram's state of mind from the events of the day. Instead of going for a run as he had planned, Bahram stayed behind and had pizza with the kids while Nooshin and her mother went out. Obviously, at least a few hours passed, since Nooshin and her mother did not arrive back until after 9:00 p.m.—after the girls' bedtime.

In those hours, waiting for Nooshin and Parvane to return, Bahram had *time*. Time to ponder the perceived unfaithfulness of his wife and brood on her supposed plots against him. Time to reflect on the ingratitude of a mother-in-law for whom he had done "everything" while she had repaid him with scornful mockery. Time to wonder if he dared follow through on what he had *already* told his brother Shawn he planned to do.

The jury could therefore logically infer that at some point, after pondering the absence of his wife and mother-in-law all evening, Bahram forced the moment to its crisis and took the knife downstairs.

There were still three opportunities to turn back. He might have turned back as he descended the stairs. Or later, as he crept around the outside of the house to eavesdrop on his wife's conversation with his mother-in-law. Or even after Nooshin heard the bushes move and screamed. Nothing required Bahram to open the sliding door and come *into* the house where he would soon stab two people. The jury could thus infer this: Only a man *already* resolute on the use of deadly force would have, upon being discovered on the outside of his home, proceeded to enter it through the sliding glass door and then pursue his wife with a knife still in his hand.

He might, of course, have descended the stairs the first time merely to satisfy his curiosity as to the discussion between his mother-in-law and his

wife, and then, prompted by yet more confirmation of his jealousy (Nooshin's telling her mother, "I talked to Farokh today") and his fears (Nooshin's reassurance to her mother that in less than two weeks he would be "finished"), gone up the stairs to get the knife and bring it down with the intention of stabbing both women. Either way, like the return to the car to obtain the rifle in *Thomas*, or the trip to the kitchen to get the steak knife in *Perez*, there was the purposeful travel to obtain the weapon, and purposeful travel to use it.

## 2. *Preexisting Motive*

As noted above, preexisting motive has clearly been an accepted category of evidence for reviewing court analysis of premeditation and deliberation since *Anderson*,[10] and has been reiterated, by the Supreme Court, as one of the "three types of evidence commonly shown in cases of premeditated murder" as recently as less than two months ago. (*Solomon, supra*, 49 Cal.4th at p. 812.)

What is remarkable about the case before us is the abundance of evidence on *preexisting* motive, that is, evidence quite independent of any reaction that the comments by Nooshin about talking to Farokh that day, or reassuring her mother of Bahram's soon being "finished," would engender. Indeed, if this case were a mystery novel, a reader might guess that someone else would have "done it" because the evidence of Bahram's preexisting motives was so strong that he had to be a red herring.

We have already recounted the abundance of motives that Bahram had before the evening of August 19, particularly as regarding Nooshin. Sexual jealousy: Bahram thought she was having an affair with an Iranian named Farokh. Money: He worried she was plotting his death for the life insurance money and to be free to be with her Iranian lover. Fear: He worried about being given drugs that simulate heart attacks. Humiliation: As Bahram would later look at events, Nooshin, fresh from her stay with her lover in Iran, was more interested in an increase in life insurance than greeting her husband.

Let us at this point, however, zero in on Parvane. By Bahram's own testimony *she* was in on the perceived plot to kill him, and certainly in his

---

[10] As mentioned above, *Anderson* derived its three categories from *People v. Thomas, supra,* 25 Cal.2d 880, citing pages 898, 900, and 901. While the word "motive" does not appear anywhere in *People v. Thomas*, the opinion repeatedly uses the phrase "pre-existing reflection." (*Id.* at pp. 892, 900, 909, 911.)

mind merited inclusion with her daughter: Hours, maybe days before the "event," Bahram had heard a tape of what he thought was Parvane laughing at his hair transplant, and in that time had occasion to reflect on how he had done "everything" for her, but she had returned his generosity with scorn.

But not only that. As Bahram related events, Parvane came to the aid of her daughter, hitting him from behind. She was thus a percipient witness to the stabbings of Nooshin, and had to be eliminated.

Our Supreme Court has recognized that the elimination of a percipient witness is motivation enough in the premeditation and deliberation context. (See *Sanchez, supra,* 12 Cal.4th at p. 35 ["The trial court could reasonably infer from the evidence that Juanita was killed in order to keep her from being a percipient witness to the murder of her husband. Thus, viewing the evidence in the light most favorable to the People, we conclude a 'rational trier of fact' could have been persuaded 'that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' "]; *Lewis, supra,* 46 Cal.4th at p. 1293 ["the jury could have concluded that his motive in killing Miller was to avoid detection"].)

### 3. *Manner of Killing*

Manner of killing is the least strong of the *Anderson* categories as the case comes to us. The manner of killing here—stabbing two victims more than two times each, including around the face, the neck and lungs—is, at least in a vacuum, associated with someone losing his mind and going berserk, which is not a state of mind we associate with premeditation or deliberation. We note an irony here: The more genteel the form of dispatch, the more readily premeditation may be inferred. Vicious brutal knifings, particularly when the victim is awake and fighting back, tend to fall on the opposite side of the spectrum from, say, the administration of arsenic in a guest's tea. That said, our Supreme Court *has,* in *Perez,* upheld a first degree murder conviction in a vicious knife attack no less gruesome than the ones here.

To be sure, Bahram did not have the element of surprise, as shown by the "defensive" wounds sustained by both victims. Even so, the numerous blows to the neck and vital organs of both victims, including a blow that penetrated Parvane's eye, supports the reasonable inference, similar to *Lewis,* that the blows were intended to kill rather than merely wound. (See *Lewis, supra,* 46 Cal.4th at p. 1293 [the "additional act of slashing her throat 'is indicative of a reasoned decision to kill' "].)

## IV. DISPOSITION

The judgment of conviction of two counts of first degree murder is affirmed.

Moore, J., and Fybel, J., concurred.

A petition for a rehearing was denied September 15, 2010, and appellant's petition for review by the Supreme Court was denied December 1, 2010, S186807.