Filed 12/23/14  P. v. Syas CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT SYAS,<br><br>      Defendant and Appellant. | C071789<br><br>(Super. Ct. No. 11F00984) |

A complaint deemed an information charged defendant Robert Syas with murder (Pen. Code, § 187, subd. (a)) and further alleged he had personally used a hammer and a knife (Pen. Code, § 12022, subd. (b)(1)).  A jury found defendant guilty of first degree murder and found the personal use allegations true.  The trial court sentenced defendant to state prison for an indeterminate term of 25 years to life plus a determinate term of one year on the personal use enhancement.  Defendant appeals, contending:  (1) insufficient

1

evidence supports his murder conviction as well as the jury's finding of premeditation and deliberation; and (2) the trial court erred in admitting certain third party testimony regarding the victim's statements. Disagreeing, we shall affirm the judgment.

## FACTS

On February 5, 2011, Pamela Johnson's son, Kenneth, found her badly beaten on the floor of her apartment. There was blood on her clothing, as well as the carpet, furniture, ceiling, air conditioner, and window blinds. She was deceased when emergency personnel arrived.

Sacramento sheriff's deputies found a bent and bloody kitchen-type knife in one of the couches and a bloody hammer behind the cushion of the love seat. The cause of death was a combination of blunt injuries to the head followed by sharp injuries to the neck. Pamela had been hit with a blunt object at least 30-37 times and cut or stabbed with a sharp object 10 times. She had 17 lacerations on her head, six to eight bruises on her face and scalp, and multiple skull fractures. Her left eye socket was fractured into multiple pieces. She had a rectangular bruise and a scratch on her neck; bruising on her chest, breasts, arms, and hands; and a broken finger. These injuries were consistent with defensive injuries to ward off the blunt force injuries to her head.

Her injuries were consistent with being struck by both the blunt edge and the claw of the hammer found at the scene. She had small stab wounds on her torso that were consistent with the tip of a knife encountering her body. She had four stab wounds to her neck -- one to the back of her neck and three on the left side -- and a large slash wound across the front of her neck, caused by a deep cutting motion with several stops and starts. The slash wound completely severed her upper airway, and cut part way through her common carotid artery and the internal jugular vein. The medical examiner opined the stab and slash wounds were inflicted after the blunt force trauma injuries. At the time she was stabbed and slashed, Pamela was unconscious and barely breathing.

She also had five stab wounds to her back. The injuries to her neck, the stab wounds on her back, and the large slash wound were all consistent with the knife found at the scene. Pamela had blood underneath one of her fingernails that was consistent with defendant's blood.

Sheriff's deputies took defendant into custody later that night. He had blood consistent with Pamela's blood at the base of the cuticle on his left thumb. He had a laceration on his left index finger, a cut on his right finger, and the knuckles of his right hand appeared swollen. Defendant denied killing Pamela. He stated after leaving Pamela's apartment, he went to his hotel room, showered, and changed his clothes. Sheriff's deputies did not find the clothes he had been wearing and it did not appear anyone had recently showered in the hotel room.

Defendant and Pamela were in a volatile dating relationship at the time of her murder. As early as 2010, defendant caused disturbances at Pamela's apartment complex, loitering in front her apartment and yelling at her to let him in. The apartment manager received complaints about fighting, arguing, and noise in Pamela's apartment. Ultimately, the manager told defendant to stay off the property and served him with no trespassing papers. Recently, the apartment maintenance man had told defendant that Pamela did not want him on the property, and that this was the reason for the service of papers.

Edward and Georgeann Blanton lived in the apartment directly behind Pamela and could hear "just about everything" in her apartment. In December 2010, they heard screaming and yelling and what sounded like somebody pounding on the wall and being dragged around Pamela's apartment. They heard defendant yell at Pamela to shut up or he would bash in her face. He also threatened to kill her. The Blantons called 911 twice in one day in December 2010 to report defendant was beating Pamela, who was screaming and telling him to get out. Pamela left her apartment in hysterics and went to her son Kenneth's apartment in the same complex. She was crying, screaming, and very

3

upset. She said defendant was in her apartment, arguing with her, and pushing and shoving her. He had pushed the front door in and knocked her to the ground with it when she answered the door. Defendant was arrested but not prosecuted after this incident.

In January 2011, Pamela called 911 because of a physical confrontation with defendant. Law enforcement mediated the situation and defendant left.

Two weeks before Pamela was killed, defendant told the Blantons he would kill them and their dog if they called 911 anymore. About a week later, Edward heard defendant threaten Pamela, "[I]f you call the cops on me, you're dead."

In early February 2011, Kenneth was checking on Pamela almost every day because she had a broken ankle. On February 4, 2011, he checked on her between 7:00 p.m. and 8:00 p.m., and she was in her apartment with defendant. At 11:00 p.m., Kenneth found defendant sitting on a blanket outside Pamela's front door. Kenneth told defendant to leave. Defendant asked Kenneth what was wrong with his mother because her attitude toward him was changing. He said he knew "the reason she don't want me there she's messing with different guys, which I know one guy named Steve." When later asked by law enforcement who Steve was, defendant answered, "Oh, this motha' fucka'--this motha'--I--I'll be real with you--boy--this motha' fucka'--let me tell--this motha'--it's my--he was my friend." Defendant had seen Pamela and Steve together and had seen them hugging.

On February 5, 2011, at approximately 11:00 a.m., the property manager saw defendant walking near the apartment complex. Edward heard defendant's voice screaming in Pamela's apartment. At approximately 3:00 p.m., Pamela was upset and went to Kenneth's apartment to get away from defendant. Kenneth was not there, but his roommates Sarah Gerard and John Cunningham were home. Pamela told Gerard and Cunningham that defendant was at her apartment causing problems. Gerard testified Pamela told her she was "upset that her and her boyfriend Bobby" "were just arguing like

4

a normal day." Defendant had locked himself inside Pamela's apartment. Pamela returned to her apartment about 4:30 p.m.

Another neighbor, John Moore, saw Pamela return to her apartment. About five minutes earlier, he had also seen the man who frequented the apartment return. Later, Moore heard a loud thump from inside the apartment, like someone being slammed against a wall. He was not able to identify anyone in a photographic lineup. A few weeks later, Moore identified a man other than defendant, but was only 50 to 60 percent certain of his identification.

Two hours later, Kenneth found Pamela's body. There was no sign of forced entry at the apartment.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant's first and third contentions concern the sufficiency of the evidence to establish his identity as the murderer as well as to show premeditation and deliberation. We address these contentions together.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--evidence that is reasonable, credible and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.) "We do not reweigh evidence or reevaluate a witness's credibility." (*Ibid.*)

5

Reversal of a first degree murder conviction for insufficiency of the evidence to establish premeditation and deliberation "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 509.)

As we have described *ante*, the evidence established the violent nature of defendant's relationship with Pamela, his previous threats to kill her, his belief that she was sexually involved with other men, his blood under her fingernails, her blood on his hand, and injuries to both defendant and his victim that were consistent with a struggle. In addition, there was evidence defendant was at Pamela's apartment complex shortly before the murder, and that they were arguing in her apartment the day of the murder. This evidence sufficiently supports the jury's finding that defendant was the murderer.

Defendant next contends the evidence was insufficient to support a *first degree* murder conviction, as the "method and circumstances of the crime indicate an unplanned, rash, and impulsive killing." Specifically, he argues applying the factors of *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), there is insufficient evidence to sustain a finding of premeditation and deliberation.

In *Anderson*, our Supreme Court recited relevant factors to consider when evaluating whether sufficient evidence supports a finding of premeditation and deliberation as follows: "(1) planning activity; (2) motive (established by a prior relationship and/or conduct with the victim); and (3) manner of killing. [Citations.] '[T]his court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or

6

evidence of (2) in conjunction with either (1) or (3).' [Citation.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 32 (*Sanchez*).)

"In identifying categories of evidence bearing on premeditation and deliberation, *Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation . . . . The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).) "Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)

Although the *Anderson* factors do not have to be present in any "special combination" or accorded a "particular weight" (*Sanchez, supra*, 12 Cal.4th at p. 33), the factors do guide our determination of whether the murder occurred as a "result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]" (*Perez, supra*, 2 Cal.4th at p. 1125; *People v. Hovarter* (2008) 44 Cal.4th 983, 1019.)

Here, there is insignificant evidence of planning activity, but an abundance of evidence of motive in conjunction with the manner of killing, as contemplated by *Anderson*, such that preexisting reflection and weighing of considerations are evident. Motive is shown by "facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim . . . ." (*Anderson, supra*, 70 Cal.2d at p. 27.) Defendant's toxic and abusive relationship with Pamela provided ample evidence of motive. The Blantons heard defendant threaten to kill her shortly before the murder, and defendant had also threatened to kill the Blantons

7

if they interfered with his relationship with Pamela by calling the police. Defendant was heard screaming in Pamela's apartment the night she was killed. He had recently learned that Pamela was trying to keep him out of the apartment complex, and he said the night before the murder that he suspected she was "messing with" other men, including his friend.

Sexual jealousy is a recognized motive for a killing and can support a finding of premeditation and deliberation. (See *Anderson*, *supra*, 70 Cal.2d at p. 29; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1117.) This record contains ample evidence from which the jury could infer that defendant had a strong motive to kill Pamela.

Although defendant contends that he had no appreciable time for consideration, we disagree and find that the *manner* of killing also supports the jury's finding of first degree murder. Defendant first hit Pamela with a hammer at least 30-37 times. As she tried to defend herself, he hit her with both the blunt head of the hammer and the claw, suggesting he changed the hammer's position as he struck her. After rendering her unconscious, defendant stopped beating Pamela with the hammer and began stabbing her with the knife, including multiple times in the neck and back. He savagely sawed at her throat as he succeeded in slitting it. This chain of events took time and consideration. Further, changing weapons in the course of a killing supports an inference of premeditation and deliberation. It is akin to seeking a second knife, reloading a gun, or using another gun when the first is out of ammunition. (*Perez*, *supra*, 2 Cal.4th at p. 1127.) Here, defendant had ample opportunity to consider the murder before it was committed. The motive and manner of killing support a finding of premeditation and deliberation.

## II

### *Admission of the Victim's Statements*

Defendant also contends that the trial court abused its discretion by admitting the testimony of Gerard and Cunningham that on February 5 Pamela had told them defendant was at her apartment "causing problems" and she and defendant were "arguing like a normal day." Defendant acknowledges the evidence was admitted for the limited purpose of explaining the subsequent conduct of Gerard and Cunningham (who apparently went and knocked on the victim's apartment door shortly after the conversation), but dismisses that purpose as irrelevant. Defendant makes no specific argument as to prejudice.

Even assuming for the sake of argument that the admitted testimony was irrelevant, any error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The trial court instructed the jury: "You are about to hear evidence of statements allegedly made by Pamela Johnson to Sarah Gerard and then the next witness John Cunningham. This evidence is admitted solely to explain the subsequent conduct by Sarah Gerard and John Cunningham. You may consider this evidence solely for that purpose and no other. The statements cannot be used by you as proof of anything contained in those statements." We presume the jurors understood and followed the court's instructions. (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502; *People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Moreover, as we have already discussed, even without the challenged statements there was ample evidence that defendant and Pamela had a volatile and violent relationship. Defendant was seen in the complex and was screaming at Pamela in her apartment the day of the murder. The apartment manager had received complaints about fighting and arguing in Pamela's apartment and had served defendant with no trespassing papers. The neighbors heard repeated fights between Pamela and defendant where they could hear him hitting her. They also heard him threaten to kill her. Even had the

9

challenged testimony regarding defendant's "causing problems" and "arguing" with the victim on February 5 been excluded, the jury heard ample evidence of the couple's arguments and defendant's related conduct, as well as his presence at the murder scene. Based on this record, it is not reasonably probable the jury would have reached a verdict more favorable to defendant in the absence of any error.

## DISPOSITION

The judgment is affirmed.

         DUARTE         , J.

We concur:

        BLEASE        , Acting P. J.

        NICHOLSON     , J.