Filed 8/8/16  P. v. Vasquez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063691 |
| v. | (Super.Ct.No. INF1300357) |
| RAYMUNDO GARCIA VASQUEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Anthony R. Villalobos, Judge.  Affirmed with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Charles C. Ragland and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Raymundo Garcia Vasquez seemed to be "obsessed" with Karina Sepulveda; she was not attracted to him, although she did accept money and rides from

1

him.  After April 28, 2011, she went missing.  On May 4, 2011, defendant went to Mexico, thus effectively quitting his job.  Also on May 4, 2011, Sepulveda's dead body was found in a remote cornfield, so badly decomposed that a cause of death could not be determined.  Eventually, defendant admitted that he drove to the cornfield with Sepulveda and left her there alone at night, but he denied killing her.

After a jury trial, defendant was found guilty on one count of first degree murder. (Pen. Code, §§ 187, subd. (a), 189.)  He was sentenced to 25 years to life in prison, along with the usual fines, fees, and miscellaneous orders.

Defendant now contends that there was insufficient evidence of premeditation and deliberation to support the finding that the murder was of the first degree.  We disagree. We will conclude that the fact that defendant had a recently heightened motive, the fact that he borrowed his roommate's car to pick Sepulveda up in, and the fact that had no credible reason to drive Sepulveda to the cornfield — other than to kill her — were sufficient to support the first degree finding.

I

FACTUAL BACKGROUND

As of April 2011, Karina Sepulveda was 19 years old.  She lived in Indio, where she worked for an insurance company.  She did not own a car, though she was saving up money to buy one.  She had no known health problems.

Defendant lived in Indio with his friend, coworker, and roommate, Felipe Navarro. Defendant worked at a Cardenas market.  In the two or three years that he had worked there, he had never requested a vacation.

2

Defendant told Navarro that he avoided going to Mexico, and that he had even skipped his father's funeral there, because he was afraid he would not be able to get back into the United States.

Sepulveda first met defendant in 2007 or 2008, when she was 16 or 17. She and a friend needed a ride back from a party, so they flagged him down and he gave them a ride. After that, Sepulveda would call defendant when she needed a ride. She also started asking him for money. He gave her money to go shopping at the mall and paid some of her bills. As a quid pro quo, she occasionally allowed defendant to perform oral sex on her. Some of these sex acts took place in defendant's car.

Defendant seemed "obsessed" with Sepulveda. He phoned her and texted her frequently. He had offered her $500 to engage in sexual intercourse with him. However, Sepulveda was not romantically or sexually interested in defendant. When he phoned or texted her, she seemed annoyed. He would try to kiss her, but she would she recoil. When he tried to touch her, she yelled at him and said, "Don't ever touch me, or else." She told a friend that he "repulsed" her.

On April 28, 2011, Sepulveda got off work at 8:00 p.m. A male acquaintance picked her up. They sat in his car, talking. At about 8:15 p.m., Sepulveda phoned a man who spoke Spanish and asked him to come and pick her up. Around 8:40 p.m., a white sports utility vehicle (SUV) pulled up. Sepulveda said that she was going to go buy a car, then got into the white SUV.

3

A security video showed a white SUV arriving at a Carl's Jr. in Thermal at 9:23 p.m. Navarro later identified it as his white Mitsubishi Montero, which defendant had borrowed.[1]

At 9:45 p.m., Sepulveda phoned a female friend. She had agreed to help the friend move that night. Sepulveda said she was at the Carl's Jr. and asked the friend to pick her up from there. Then she said, "Never mind. Just come to my house."

At 9:48 p.m., Sepulveda posted a photo to Facebook showing her hand holding nine $100 bills fanned out.

The last time Sepulveda used her cell phone was at 9:59 p.m. She was never heard from or seen alive again.

In the three days from April 26 through April 28, defendant had phoned or texted Sepulveda some 71 times. However, between April 29 and May 3, he did not phone or text her at all.

On May 1, defendant asked to transfer to a Cardenas store in Las Vegas, but there were no openings there. Also on May 1, he requested a 14-day vacation, from May 9

---

[1] Defendant owned a red Mustang. On direct, Navarro testified that it had "a mechanical problem with the clutch" and the air conditioning did not work. On cross, he added that it had bad tires. He had told the police that it had bad tires, but not that it had a bad clutch or bad air conditioning. Defendant nevertheless drove the Mustang to work. Navarro also testified: "During the time [defendant's] car was having problems, we were constantly switching cars."

through May 23. He explained that "he had to go to Mexico to fix [a] situation" there.**2** Under Cardenas's rules, if he took off work before May 9, he would be fired.

On May 4, a little before 2:00 p.m., Sepulveda's dead body was found in a cornfield at Avenue 50 and Fillmore Street in Coachella. Around it, there was a circle of flattened corn. The body was clothed; the position of the clothing indicated that the body had been dragged to where it lay. Sepulveda's purse and cell phone were not present.

Insect activity indicated that Sepulveda had died a minimum of four and a half to five and a half days before her body was found, and possibly more.

As a result of decomposition and animal activity, the cause of death could not be determined. A shooting or a stabbing could be ruled out. Some natural causes could be ruled out, but not all. A toxicology screen for over 150 different drugs was negative.

Blunt force trauma to the head could not be ruled out; however, there were no skull fractures and "[n]o hemorrhaging in what was left of the brain." Normally, with blunt force trauma, one would expect to see hemorrhaging.

Strangulation also could not be ruled out; however, the hyoid bone and the larynx were not broken and there was no swelling of the larynx. A forensic pathologist testified that you would "always" expect to see such injuries in a strangulation case.

Finally, asphyxiation could not be ruled out. Asphyxiation would have taken a minimum of five minutes.

---

**2** However, he told Navarro that he wanted to see his mother for Mother's Day.

Defendant's DNA was found under Sepulveda's fingernails, in a small quantity more consistent with tissue (or even perspiration) than semen. No semen was found on the body.

On May 4, the fact that the body had been found was reported in the news. Also on May 4, defendant went to Mexico. Navarro asked him for his subscriber identity module (SIM) card, because he believed that defendant would not be able to use it in Mexico. Defendant took the SIM card out of his phone, but instead of giving it to Navarro, he broke it, saying "it wasn't any good." Defendant did not take his Mustang. While he was in Mexico, he sold it to Navarro.

Starting on June 3, defendant tried repeatedly to reenter the United States, but he was arrested every time.

On June 13, Detective James Campos interviewed Navarro. He also asked Navarro for a DNA sample. Navarro contacted defendant and told him what had happened.

On June 28, defendant sent a text message to Detective Campos, saying, "Hi, police. This is Raymundo Garcia. I know you are looking for me for the [death] of Karina Sepulveda. Call me at this number. I want to speak with you all."

On July 13, Detective Campos spoke to defendant on the phone. Defendant confirmed that, on April 28, he picked Sepulveda up to take her car-shopping. He was going to let her charge $1,500 for the down payment to his credit card. At his suggestion, she took the photo of herself holding the cash and posted it on Facebook.

6

Defendant and Sepulveda went to a couple of car dealerships, but they were closed. Sepulveda wanted something to eat, so they went to the Carl's Jr. Next, Sepulveda told defendant to drive to Avenue 50, as this would take them to some junkyards that sold used cars.**3**

Meanwhile, Sepulveda started fondling defendant's penis over his clothes. Defendant stopped the car somewhere on Avenue 50. She masturbated him to ejaculation. Then they got into an argument over money. Sepulveda got out and walked away, and defendant drove home without her.

On August 11, Detective Campos spoke to defendant on the phone again. He told defendant — falsely — that there was surveillance video of the cornfield. Defendant replied, "[I]f that were so, you would already have come to get me here."

On October 26, Detective Campos and defendant met at the Mexican border. Defendant was unhappy in Mexico and wanted to get back into the United States. He said that, in the week Sepulveda died, "he had a plan to get married." He asked her to sign a written contract to marry him. "[H]e would pay [her] . . . $10,000 so she would marry him, and he would become a citizen[.]" The money he was giving her for the car would be treated as an advance against the $10,000. She said she would sign it, but then she "just kind of put it off to the side." He was "upset" because he believed she was reneging.

---

**3** Cell phone records enabled the prosecution to create a map of defendant and Sepulveda's approximate path. These documents have not been transmitted to us, but apparently they were generally consistent with defendant's account.

7

Using a map, defendant indicated that he had parked at Avenue 50 and Polk Street; this was about a mile from where the body was actually found. He said that he went to Mexico partly because he had not heard from Sepulveda and he assumed she was mad at him.

Finally, on August 14, 2012, Detective Campos and defendant met again at the Mexican border. This time, defendant claimed, for the first time, that he had been attacked by carjackers who conspired with Sepulveda.[4]

According to defendant, as he and Sepulveda were driving, a car pulled up next to them. A man and a woman inside smiled at them.

Defendant admitted for the first time that he parked at Avenue 50 and Fillmore. After Sepulveda masturbated him, the car door opened and a man and a woman were there. Defendant believed that the other car had followed them, and the man and the woman had been dropped off there. Sepulveda said, "Vengeance is sweet." She added that the people wanted his car and his money. The man and the woman forced defendant out of the car. In the process, his shoes came off.[5] They beat him and he blacked out.

When he came to, he heard Sepulveda asking for help. Her face was bleeding. Defendant wiped some of his blood onto a cornstalk. He also wiped some of Sepulveda's

---

[4] The defense theory was that defendant's original account was true and that defendant made up the carjacking story because he wanted Detective Campos to help him get back into the United States.

[5] In the prosecution's view, defendant was trying to explain away some bare footprints that were found at the scene.

8

blood onto a cornstalk.[6]  Sepulveda said, "I am sorry.  This won't happen again.  I will marry you.  We will be happy."  Defendant felt "very betrayed."  He did not want to listen to her anymore, so he put his hand over her mouth and said, "Shut up."  However, he denied cutting off her breathing.

Defendant tried to take a video with his phone "to show that she was alive . . . when he was leaving," but the battery was low and the password did not seem to work.  He got into the car (which the carjackers, for some reason, had not taken) and went home.

II

THE SUFFICIENCY OF THE EVIDENCE

OF PREMEDITATION AND DELIBERATION

Defendant contends that there was insufficient evidence of premeditation and deliberation to support the first degree murder verdict.

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.  [Citations.]"  (*People v. Cole* (2004) 33 Cal.4th 1158, 1212.)

---

**6**      The police found no blood at the scene.  The prosecution's theory was that there had been blood on Sepulveda's face, but it had been obliterated by insect activity.

"' . . . In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212-1213.) ""'"An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]'" [Citation.]' [Citation.]" (*People v. Salazar* (2016) 63 Cal.4th 214, 242.)

A conviction of first degree murder may be based on several alternative theories; one is that the killing was "willful, deliberate, and premeditated . . . ." (Pen. Code, § 189.) "'"Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'" [Citation.]" (*People v. Sandoval* (2015) 62 Cal.4th 394, 424.)

"'In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, . . . th[e Supreme C]ourt reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [It] described three categories of evidence recurring in those cases: planning, motive, and manner of killing. [Citations.] The *Anderson* decision stated: "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either

10

[planning] or [manner of killing]." [Citation.] Since *Anderson*, [the Supreme Court has] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight.' [Citation.]" (*People v. Sandoval*, *supra*, 62 Cal.4th at p. 424.)

"And in fact, in several recent cases, the Supreme Court has described the various *Anderson* categories in the disjunctive, inserting an 'or' in the series, as if to emphasize that a first degree murder conviction may be upheld with evidence from any of the three categories: 'First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly . . . and is evidenced by planning activity, a motive to kill, or an exacting manner of death.' [Citation.]" (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1113.)

"'"*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]"' [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 242.)

Here, there was evidence of motive. Defendant was strongly attracted to Sepulveda, but she withheld affection from him. She rejected him in front of others while using him to get money and rides. According to defendant himself, in the week before the killing, he planned to marry Sepulveda. She had agreed to marry him in exchange for $10,000; however, when he asked her to sign a written contract to that effect, she put him off. He admitted that he was "upset" because she seemed to be

11

reneging.  Also according to defendant, immediately before she disappeared, they got into a heated argument over money.

In addition, there was evidence of planning activity.  First, defendant borrowed his roommate's white SUV.  It is reasonably inferable that he was trying to prevent his own car from being identified in connection with the crime, whether by an eyewitness or by physical evidence.  Admittedly, his roommate tried to explain this away by claiming that defendant's Mustang had mechanical problems.  However, his statements were inconsistent as to whether the problem was with the clutch and air conditioner or with the tires.  He admitted that defendant regularly drove the Mustang to work.  He also admitted that he regularly drove the Mustang whenever defendant drove his car.

Second, defendant drove Sepulveda to a dark, isolated, rural area and stopped there with her.  He claimed that she told him to drive on Avenue 50 because it led to some junkyards.  However, Sepulveda had only just told her friend to come to her house and pick her up there, so she could help the friend move.  In addition, there was no evidence that there were, in fact, any junkyards in the direction that defendant and Sepulveda were traveling.  Finally, they got to Avenue 50 sometime later than 9:23 p.m., when they were videotaped at the Carl's Jr.  Nobody would suppose that a junkyard would be open at that time of night — particularly if, as defendant claimed, they had already gone to two car dealerships and found them both closed.

The People rely not only on motive and planning activity, but also on the manner of killing.  They argue that it was reasonably inferable that defendant asphyxiated Sepulveda, which would have taken over five minutes.  Defendant retorts that, according

12

to the prosecution's own expert, the cause of death could not be determined; she could not rule out blunt force trauma or strangulation, or even natural causes.

We need not decide this issue. In light of the evidence of motive and evidence of planning activity — even assuming there was no evidence of the manner of killing — we conclude that there was sufficient evidence of premeditation and deliberation.

## III

## ERRORS IN THE ABSTRACT OF JUDGMENT

Defendant contends that the abstract of judgment contains two errors. The People concede both. First, the abstract incorrectly states that defendant was sentenced on June 5, 2015. The correct date is May 29, 2015. Second, a checkmark in Box 8 incorrectly indicates that defendant was sentenced pursuant to one of several listed recidivist statutes. In our disposition, we will direct the trial court clerk to correct the abstract.

## IV

## DISPOSITION

The judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment correcting the two errors specified in part III, *ante*, and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. (Pen. Code, §§ 1213, subd. (a), 1216.)

13

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

CODRINGTON
J.