Filed 2/10/16  P. v. Mateo CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B258333 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.BA414092) |
| v. | |
| MILTON MATEO et. al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed.

Law Offices of James Koester, James Koester, under appointment by the Court of Appeal, for Defendant and Appellant Milton Mateo.

Edward J. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant Gunni Scroggins.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Milton Mateo initiated a fistfight with rival gang member Edwin Cuatlacuatl outside a Los Angeles grocery store. Codefendant Gunni Scroggins, Mateo's companion and fellow gang member, entered the fray and stabbed Cuatlacuatl twice in the neck before fleeing the scene with Mateo. A jury found both Mateo and Scroggins guilty of attempted premeditated murder, the only offense charged.

Both defendants now contend their convictions are legally invalid and must be reversed. Mateo argues his conviction as an aider and abettor cannot stand because the jury did not find that attempted premeditated murder was a reasonably foreseeable consequence of the fistfight. He acknowledges that *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*) forecloses this argument, but contends *Favor* was "unquestionably disapproved" and "functionally eviscerat[ed]" by *Alleyne v. United States* (2013) __ U.S. __, 133 S. Ct. 2151 (*Alleyne*) and *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). Scroggins contends his conviction must be reversed because the evidence presented at trial permitted the reasonable conclusion that he intended only to assault rather than kill Cuatlacuatl. Scroggins further argues that the prosecutor reduced the state's burden of proof and undermined Scroggins's defense by misstating the law during closing argument, and presented insufficient evidence of premeditation.

We reject defendants' arguments and affirm their convictions.

## PROCEDURAL HISTORY

In an information dated September 10, 2013, the District Attorney of the County of Los Angeles ("the People") charged defendants with one count of attempted willful, deliberate, and premeditated murder (Pen. Code §§ 187, subd. (a), 664, subd. (a)),[1] in connection with the Cuatlacuatl altercation. The People further alleged defendants committed the offense for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). The People also alleged defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Scroggins personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury upon Cuatlacuatl (§ 12022.7, subd. (a)).

Defendants proceeded to a joint jury trial in July 2014. The jury found both defendants guilty of attempted murder; found true the allegation that the attempted murder was willful, deliberate, and premeditated; found true the gang allegation; and found true the weapons and bodily injury allegations against Scroggins. The court sentenced Mateo to 15 years to life, and sentenced Scroggins to 19 years to life. Both defendants timely appealed.

## FACTUAL BACKGROUND

On March 6, 2013, Mateo and Scroggins went to the Food 4 Less grocery store located at 1700 West 6th Street in Los Angeles with Mateo's friend and neighbor Federico Salanga. The Food 4 Less was within territory claimed by the 18th Street gang but was less than half a block from territory claimed by a rival gang, Rockwood. Both Mateo and Scroggins were members of the Colombia Little Cycos clique of the 18th Street gang. Mateo's gang moniker was "Gunner," and Scroggins's was "Psycho." Both defendants had tattoos signifying their affiliation with 18th Street.

Salanga went into the Food 4 Less around 11:20 a.m. Mateo and Scroggins remained outside, standing together near the entrance. Meanwhile, Cuatlacuatl and Mary Morales approached the Food 4 Less on foot. Cuatlacuatl was a member of the Rockwood gang.

Mateo made eye contact with Cuatlacuatl, lifted the Lakers jersey he was wearing to expose an "18" tattooed on his stomach, and yelled, "18th Street" and "Fuck Cockwood." Mateo then "charged" at Cuatlacuatl and repeatedly punched him in the face.[2] Cuatlacuatl defended himself by fighting back.

---

[2] Mateo and Scroggins both assert that Mateo took off his glasses and jacket and handed them to Scroggins before charging at Cuatlacuatl. Mateo argued the same point repeatedly during his opening and closing statements, and Scroggins mentioned it during closing as well. None of the record evidence they cite in their briefs supports the assertion, however. The surveillance video from the Food 4 Less, which appears to be

While Mateo and Cuatlacuatl were exchanging blows, Scroggins pulled out a knife and began stabbing Cuatlacuatl. Scroggins cut Cuatlacuatl's right thumb, left arm, and neck. Mateo "kind of stopped" fighting but then continued punching Cuatlacuatl, who fell to the ground. When Morales saw Scroggins's "hand going up and down with a knife" and blood "coming down [Cuatlacuatl's] neck," she pulled on Scroggins's shirt and ultimately succeeded in extracting him from the fray. Morales thought Scroggins might stab her at that point, but he and Mateo ran away instead.

Cuatlacuatl was "bleeding bad like a lot." Morales used Cuatlacuatl's bloody shirt to hold a piece of skin onto one of his neck wounds; the skin was "kind of like falling off." Morales walked Cuatlacuatl to Good Samaritan Hospital, which was about two blocks from the Food 4 Less. At the hospital, medical personnel stitched the wounds on Cuatlacuatl's neck, arm, and thumb. Cuatlacuatl was left with two scars on his neck. The first, on the left side of his neck, was an inch-and-a-half in length; the other, on the back of his neck, was about two inches long. Cuatlacuatl also had a two-and-a-half- or three-inch scar on his left forearm and a half-inch scar on the inside of his right thumb. He was discharged from the hospital after a couple of hours and did not sustain any lasting injuries aside from the scars.

Los Angeles Police Department officers Ernesto Carbajal and John Melendez separately interviewed Cuatlacuatl while he was at the hospital. Both officers testified that Cuatlacuatl told them he had been stabbed during a fight with two men. According to the officers, Cuatlacuatl described one of the men as a Hispanic who wore a Lakers jersey and the other as an African-American who wore dark-colored clothing and did the actual stabbing. Cuatlacuatl told Melendez he recognized both assailants as members of 18th Street and believed he was attacked because of his gang affiliation. Cuatlacuatl refused to identify any photographs in the array Melendez showed him. Morales later identified a photograph of Mateo as the Hispanic male who initiated the fight with Cuatlacuatl and identified a photograph of Scroggins as thinner but similarly complected

the basis for defendants' claim, was in evidence at trial but was not included in the record on appeal.

4

to the African-American male who stabbed Cuatlacuatl.  Two other police officers familiar with the 18th Street gang identified Mateo and Scroggins as the assailants after watching a surveillance video from the Food 4 Less.

Los Angeles Police Department officer Mayra Villafana testified as the People's gang expert.  Villafana testified that gangs commit crimes including murders, attempted murders, assaults with deadly weapons, robbery, grand theft auto, and extortion.  Gang members gain status in their gangs by "put[ting] in work," or committing crimes.  Gang members who commit violent crimes move up more quickly.  In addition to improving their stature within the gang, members who commit violent crimes instill more fear in their rivals and in the community in general.  Gangs as a whole benefit from such behavior.  Rival gangs that fear and respect the gang are less likely to enter its territory and attack, and community members who fear the gang are less likely to report crimes committed by the gang.

Gang members challenge or "hit up" members of rival gangs by asking where they are from and engaging them in violent altercations like assaults, shootings, and stabbings when they reveal their allegiances.  Gang members also "intentionally disrespect" members of rival gangs by entering and painting graffiti in their territory, assaulting them, or using insults like "Fuck Cockwood," a derogatory term for the Rockwood gang.  Gang members who have been disrespected retaliate, which "can result in assaults, physical assaults, they can escalate to a shooting, to a stabbing, to murder, to death."  Often, gang members retaliate or commit crimes in groups because "[t]here is definitely strength in numbers"; if more than one member is present, the members can help one another.  Gang members who stand by and do nothing when one of their brethren is assaulted are perceived as weak and "can become no good to the neighborhood."

Villafana testified that the 18th Street gang adhered to these gang norms.  Villafana personally had investigated attempted murders, robberies, and assaults with a deadly weapon during the course of her work with the Colombia Little Cycos clique or subdivision of the 18th Street gang.  The primary activities of the 18th Street gang, which had 7,000 to 9,000 members in Los Angeles and 30,000 to 50,000 nationwide, included

5

murders, attempted murders, and assaults with deadly weapons. Two members of the Los Angeles 18th Street gang previously had been convicted of assault with a deadly weapon and attempted robbery.

Individuals signified their membership in the18th Street gang by wearing dark-colored clothing, belt buckles with the letters D or E on them, and tattoos depicting the number 18, the Spanish word for 18 (dieciocho), the roman numeral for 18, or 666 (which adds to 18). Members also had tattoos of "a demon figure like cartoon with horns," "B.E.S." for Barrio 18th Street, and abbreviations for their respective cliques. Based on their self-admissions, social associations, and tattoos, Villafana opined that Mateo and Scroggins were active members of the 18th Street gang. Villafana further opined that Cuatlacuatl was an active member of the Rockwood gang.

When given a hypothetical mirroring the facts of the case, Villafana opined that the attack on Cuatlacuatl was committed for the benefit of, at the direction of, or in association with a criminal street gang. Villafana testified that such an attack would serve to uphold the gang's violent reputation, because "[a]ssault with a knife are [*sic*] one of the most violent crimes a gang can commit against another member." She further testified that committing the attack in broad daylight at a grocery store after yelling out the gang's name "broadcasts to victims, to witnesses, to the rival gang[,] to the whole community as a whole, this is their territory, this is their hood and they'll do whatever it takes to display control over the territory."

Villafana opined that the attack was in association with a criminal street gang because it demonstrated "how gang members can work in concert" and "assist each other in the execution of a crime." She further explained that "[g]ang members know when another gang member has a weapon whether it be a gun, a knife, you know whatever they use, a hammer," and that gang members within their own territory would expect an interloping rival to have a weapon. If the gang members encountered such an interloper, Villafana opined, she would expect a confrontation, "[a]nything from an assault to a shooting to stabbings," and "[k]illing maybe." The gang members within their territory

6

would "not necessarily" plan to kill during the confrontation; "[s]ometimes it can be a fist fight," "[s]ometimes it's a stabbing," "[s]ometimes it's a shooting."

## DISCUSSION

### I. Defendant Mateo's Claims

Defendant Mateo concedes that the evidence "reasonably established" that he was a direct perpetrator of an assault upon Cuatlacuatl and became an aider and abettor to Scroggins's attempted murder of Cuatlacuatl when Scroggins entered the fight and stabbed Cuatlacuatl. He contends, however, that because the prosecution relied on the natural and probable consequences doctrine, the jury should have had to make an additional finding that willful, deliberate, and premeditated attempted murder – as opposed to unpremeditated attempted murder – was a reasonably foreseeable consequence of his assault of Cuatlacuatl. He further argues that his foresight of an attempted premeditated murder was a necessary element of the crime that rendered the jury instructions incomplete and lessened the prosecution's burden of proof. Mateo recognizes that these arguments are foreclosed by *Favor*, *supra*, 54 Cal.4th 868, but urges us to find that "two significant cases," *Alleyne*, *supra*, 133 S. Ct. 2151 and *Chiu*, *supra*, 59 Cal.4th 155, "are directly at odds with the *Favor* court's reasoning and unquestionably cast doubt upon the continuing viability of the *Favor* holding." Although Mateo's contentions are cogent, we conclude that we are compelled to follow the teachings of *Favor* unless and until it is overruled by our Supreme Court or the United States Supreme Court.

#### A. The Natural and Probable Consequences Doctrine

##### 1. General Legal Principles

"The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion.' [Citations.]" (*Chiu*, *supra*, 59 Cal.4th at p. 164.) (Italics in original.) "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable

7

person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.) Whether a consequence was reasonably foreseeable "is a factual issue to be resolved by the jury who evaluates all the factual circumstances of the individual case." (*Favor*, *supra*, 54 Cal.4th at p. 874; see also *People v. Medina*, *supra*, 46 Cal.4th at p. 920.)

### 2. Use in this Case

The People invoked the natural and probable consequences doctrine in their case against Mateo. During closing argument, the prosecutor argued that Mateo was guilty under both direct aiding and abetting principles and the natural and probable consequences doctrine. The prosecutor also told the jurors that they did not have to agree on the theory under which Mateo was guilty: "[a]s long as all 12 of you agree that defendant Mateo is guilty as an aider and abettor it doesn't matter, if you all agree he aided. He was an aider and abettor and he knew it was going to happen or he was an aider and abettor under natural and probable consequence. The evidence in this case shows that he aided and abetted Mr. Scroggins in the attempted murder and they are both guilty of that crime as long as you all agree he aided and abetted Scroggins of that attempted murder."

The prosecutor explained that "[a]s long as you find that defendant Scroggins' act was wilfull [*sic*], deliberate and premeditated defendant Mateo is also guilty. The allegation is also true as to defendant Mateo as well." This explanation was consistent with the pertinent CALCRIM jury instructions the court delivered, Nos. 400 ("Aiding and Abetting: General Principles"), 401 ("Aiding and Abetting: Intended Crimes"), 403 ("Natural and Probable Consequences (Only Non-Target Offense Charged)"), 600 ("Attempted Murder (Pen. Code, §§ 21a, 663, 664)"), 601 ("Attempted Murder: Deliberation and Premeditation (Pen. Code, §§ 21a, 189, 664(a))"), and 915 ("Simple Assault (Pen. Code, §§ 240, 241(a))"). The court overruled Mateo's objection that CALCRIM No. 403 was constitutionally deficient under *Chiu* because it did not require

8

the People to prove all elements of attempted premeditated murder as to Mateo.[3] The court told Mateo it understood and appreciated his argument, but ultimately concluded "that until we are told otherwise this is the current state of the law."

### B.   Analysis

#### 1.   *Favor*

The "current state of the law" to which the trial court referred was established in *Favor*, *supra*, 54 Cal.4th 868. There, the Supreme Court considered an issue virtually identical to that Mateo presents here: whether an aider and abettor who knew of and intended to facilitate the target offense of robbery could be convicted of attempted premeditated murder under the natural and probable consequences doctrine where the jury was instructed only that attempted murder was a natural and probable consequence of the robbery. The court concluded such a conviction was permissible, holding that "the jury need not be instructed that a premeditated attempt to murder must have been a natural and probable consequence of the target offense." (*Favor*, *supra*, 54 Cal.4th at p. 872.) That is, "there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*Id.* at p. 880.)

The court's decision largely rested upon its conclusion that attempted premeditated murder and attempted unpremeditated murder are not separate offenses. (See *Favor*, *supra*, 54 Cal.4th at p. 876.) The court reasoned that "'[t]he provision in section 664, subdivision (a), imposing a greater punishment for an attempt to commit a murder that is "willful, deliberate, and premeditated" does not create a greater degree of attempted murder but, rather, constitutes a penalty provision that prescribes an increase in punishment (a greater base term) for the offense of attempted murder.' ([*People v.*]

---

[3] In light of Mateo's objections to CALCRIM No. 403 on the very grounds he argues here, we are not persuaded by Respondent's contention that his appellate claims are forfeited.

9

*Bright* [(1996)] 12 Cal.4th [652] at pp. 656-657 [ ].)"[4]  (*Favor*, *supra*, 54 Cal.4th at p. 877.)  "Thus, 'premeditated attempted murder is not a separate offense from attempted murder.' [Citation.]"  (*Ibid.*)  The court reached this conclusion notwithstanding *People v. Seel* (2004) 34 Cal.4th 535, which disapproved of *People v. Bright* and held that the increased penalty provision for attempted premeditated murder in section 664, subdivision (a) "exposes a defendant to a greater punishment than that authorized by a jury's guilty verdict of attempted murder" and therefore is the """"functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict"'" for purposes of federal double jeopardy protection."  (*Favor*, *supra*, 54 Cal.4th at p. 877, fn. 2, citing *People v. Seel*, *supra*, 34 Cal.4th at pp. 547-548 and *Apprendi v. New Jersey* (2000) 530 U.S. 466, 494, fn. 19.)

The *Favor* court also relied upon *People v. Lee* (2003) 31 Cal.4th 613, 616 (*Lee*), in which it held that the premeditation penalty provision set forth in section 664, subdivision (a) "must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted willfully and with deliberation and premeditation, even if he or she is guilty as an aider and abettor."  In *Lee*, the court reasoned that section 664, subdivision (a) "makes no distinction between an attempted murderer who is guilty as a direct perpetrator and an attempted murderer who is guilty as an aider and abettor" and does not

---

[4] Section 664, subdivision (a) provides:  "If the crime attempted is punishable by imprisonment in the state prison, or by imprisonment pursuant to subdivision (h) of Section 1170, the person guilty of the attempt shall be punished by imprisonment in the state prison or in a county jail, respectively, for one-half the term of imprisonment prescribed upon a conviction of the offense attempted.  However, if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole.  If the crime attempted is any other one in which the maximum sentence is life imprisonment or death, the person guilty of the attempt shall be punished by imprisonment in the state prison for five, seven, or nine years.  The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact."

distinguish "between an attempted murderer who personally acted with willfulness, deliberation, and premeditation and an attempted murderer who did not so act." (*Lee*, *supra*, 31 Cal.4th at p. 623.) It accordingly concluded that premeditation is not a required "component" of an aider and abettor's mental state. (*Favor*, *supra*, 54 Cal.4th at p. 877.) Although the defendant in *Lee* was tried as a direct aider and abettor, the court recognized that an aider and abettor convicted under the natural and probable consequences doctrine "may be less blameworthy" than a direct aider and abettor, and noted that it "would not have been irrational for the Legislature to limit section 664(a) only to those attempted murderers who personally acted willfully and with deliberation and premeditation." (*Lee*, *supra*, 31 Cal.4th at pp. 624-625.) The court added, "But the Legislature has declined to do so." (*Id.* at p. 625.) The court reiterated these observations in *Favor*, (*Favor*, *supra*, 54 Cal.4th at pp. 877-878), and further noted that the Legislature had modified other portions of section 664, including portions of subdivision (a), but left the penalty provision unchanged (*id.* at p. 879).

The *Favor* court supported its conclusion with one additional rationale: "the jury does not decide the truth of the penalty premeditation allegation until it first has reached a verdict on the substantive offense of attempted murder." (*Favor*, *supra*, 54 Cal.4th at p. 879.) The court reasoned that the demarcation between the jury's findings means that "attempted murder—not attempted premeditated murder—qualifies as the nontarget *offense* to which the jury must find foreseeability." (*Ibid.*)

### 2. *Alleyne* and *Chiu*

Mateo contends the rationales underlying the ruling in *Favor* have "been thoroughly repudiated" by two subsequent cases, *Alleyne* and *Chiu*. In *Alleyne*, *supra*, 133 S. Ct. 2151, 2155, 2156, the U.S. Supreme Court held that the Sixth Amendment requires any fact that increases the mandatory minimum penalty for a crime to be treated as an "element" of the crime that must be submitted to the jury and found true beyond a reasonable doubt. This holding was based upon and followed from the court's earlier decision in *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, which held that any fact which

11

increases the maximum penalty for a crime is an element of the offense that a jury must find true beyond a reasonable doubt.

Approximately one year after the decision in *Alleyne*, our Supreme Court held in *Chiu*, *supra*, 59 Cal.4th at pp. 158-159 that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." The *Chiu* court reasoned that the mental state underlying premeditated murder is "uniquely subjective and personal," and that the "connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

The *Chiu* court discussed *Favor* at length. As Mateo acknowledges, "the *Chiu* Court did consider its earlier holding in *Favor*, and specifically did not disapprove its *Favor* reasoning." The *Chiu* court found *Favor* "distinguishable in several respects" and "not dispositive" of the issues presented in *Chiu*. (*Chiu*, *supra*, 59 Cal.4th at p. 163.) The court explained: "Unlike *Favor*, the issue in [*Chiu*] does not involve the determination of legislative intent as to whom a statute applies. Also, unlike *Favor*, which involved the determination of premeditation as a requirement for a statutory penalty provision, premeditation and deliberation as it relates to murder is an element of first degree murder. In reaching our result in *Favor*, we expressly distinguished the penalty provision at issue there from the substantive crime of first degree premeditated murder on the ground that the latter statute involved a different *degree* of the offense. [Citation.] Finally, the consequence of imposing liability for the penalty provision in *Favor* is considerably less severe than in imposing liability for first degree murder under the natural and probable consequences doctrine. Section 664(a) provides that a defendant convicted of attempted murder is subject to a determinate term of five, seven, or nine years. If the jury finds the premeditation allegation true, the defendant is subject to a sentence of life with the possibility of parole. [Citation.] With that life sentence, a defendant is eligible for parole after serving a term of at least seven years. (§ 3046, subd.

12

(a)(1).)  On the other hand, a defendant convicted of first degree murder must serve a sentence of 25 years to life.  (§ 190, subd. (a).)  He or she must serve a minimum term of 25 years before parole eligibility.  (§ 3046, subd. (a)(2).)  A defendant convicted of second degree murder must serve a sentence of 15 years to life, with a minimum term of 15 years before parole eligibility.  (§§ 190, subd. (a), 3046, subd. (a)(2).)"  (*Ibid.*)

Mateo contends that the reasons the *Chiu* court used to distinguish *Favor* are, like *Favor* itself, "readily undermined" by *Alleyne*.  This contention is a reasonably plausible one.  *Alleyne* held that a fact that increases the minimum punishment associated with an offense "is by definition an element of the offense" that must be found true beyond a reasonable doubt by a jury (*Alleyne*, *supra*, 133 S. Ct. at p. 2158), and *Chiu* continued to characterize section 664, subdivision (a), which increases the minimum punishment for an attempted murder that is premeditated, as a "statutory penalty provision."  (*Chiu*, *supra*, 59 Cal.4th at p. 163.)  However, our Supreme Court offered additional state law bases in support of the continued vitality of *Favor* (and its predecessor case *Lee*, *supra*, 31 Cal.4th 613), notably the Legislature's intent in enacting and maintaining section 664, subdivision (a).  (See *Chiu*, 59 Cal.4th at pp. 162-163.)

Moreover, nothing in *Chiu* indicates our Supreme Court was unaware of or incorrectly understood federal constitutional law.  Although *Chiu* did not rely upon or even cite *Alleyne* (see generally *Chiu*, *supra*, 59 Cal.4th 155), we presume the Supreme Court was aware of *Alleyne*.  (See *People v. Harden* (2003) 110 Cal.App.4th 848, 865.)  The court previously noted *Alleyne* in two cases, *People v. Nunez* (2013) 57 Cal.4th 1, 39, fn. 6 and *People v. Harris* (2013) 57 Cal.4th 804, 880 (conc. opn. of Kennard, J.).  Notwithstanding *Alleyne*, our Supreme Court in *Chiu* elected to leave *Favor* and *Lee* intact, and maintain a distinction between first degree murder and attempted premeditated murder for purposes of the natural and probable consequences doctrine.

"[A]ll tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction."  (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.)  It is not our "function to attempt to overrule decisions of a higher court," (*ibid.*) and we conclude we may not do so here.

13

*Alleyne*'s discussion of Sixth Amendment principles is not so "clear and unavoidable" as to present the "unusual circumstances" which warrant a departure from the general mandate of stare decisis (*People v. Saez* (2015) 237 Cal.App.4th 1177, 1207), and we are not persuaded that the application of a two-year-old case previously noted by our Supreme Court presents a matter of first impression appropriate for our review of controlling Supreme Court precedent (*People v. Johnson* (2012) 53 Cal.4th 519, 527-528). We accordingly follow *Favor* and reject Mateo's appellate claims, though we encourage Mateo to pursue them before our Supreme Court.

## II. Defendant Scroggins's Claims

Defendant Scroggins challenges his conviction on three bases. First, in a twist on the traditional insufficiency of the evidence argument, he contends his conviction must be reversed because the evidence permitted "two separate but reasonable conclusions: (1) Scroggins intended to kill Cuatlacuatl; (2) Scroggins intended no more than to assault and inflict injuries on Cuatlacuatl." He claims the jury's conclusion he intended to kill contravened CALCRIM No. 224, which instructs that "[i]f you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." Second, Scroggins makes the related argument that "the further conclusion that he premeditated was not the only reasonable conclusion from the evidence," and, alternatively, "[n]one of the generally recognized standards to support a finding of premeditation is present here." Finally, Scroggins argues the prosecutor misstated the law during closing argument, thereby reducing the People's burden of proof and undermining his defense. None of these arguments is persuasive.

### A. Sufficiency of the Evidence

#### 1. Standard of Review

Scroggins contends that our review of his CALCRIM No. 224 argument should be de novo because it presents a mixed question of law and fact, "because the relevant facts were not disputed and because the applicable law is a fundamental principle in criminal cases." We disagree. As the Supreme Court explained when discussing CALJIC No.

14

2.01, the predecessor to CALCRIM No. 224, the instruction does not lessen the prosecutor's burden or otherwise lead the jury down an impermissible path. "'The rule . . . does no more than to instruct the jury that if a reasonable doubt is created in their minds for any reason they must acquit the defendant. But where the jury rejects the hypothesis pointing to innocence by its verdict, and there is evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, this court is bound by the finding of the jury.' [Citation.]" (*People v. Towler* (1982) 31 Cal.3d 105, 118.) "Thus, even though the appellate court may itself believe that the circumstantial evidence might reasonably be reconciled with the defendant's innocence, this alone does not warrant interference with the determination of the trier of fact." (*Ibid.*) In other words, we do not conduct a de novo review. "[T]he relevant inquiry on appeal remains whether *any* trier of fact could have found the defendant guilty beyond a reasonable doubt." (*Ibid.*) It was for the jury to decide whether Scroggins intended to kill or merely assault and injure Cuatlacuatl, and it is not our role to reweigh this evidence on appeal.

## 2.    Intent to Kill

Scroggins acknowledges "the circumstantial evidence was sufficient to permit a reasonable conclusion of an intent to kill." We agree and accordingly affirm his conviction. The evidence at trial showed that Scroggins entered and escalated a fistfight by pulling a knife. Scroggins stabbed rival gang member Cuatlacuatl at least four times while Mateo continued to pummel him. Two of the stab wounds, which resulted in long gashes and skin "falling off," were to Cuatlacuatl's neck, "an extremely vulnerable area of the body." (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1114; see *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118.) Scroggins continued his attack until Morales forcibly pulled him away from the fight, and fled the scene while Cuatlacuatl bled "bad like a lot." A jury reasonably could infer from this evidence that Scroggins intended to kill rather than merely injure Cuatlacuatl.

Villafana's testimony that gang members do not always intend to kill during confrontations with rivals does not compel a different conclusion. The evidence supported the inference that Scroggins intended to kill in this particular case. Likewise,

15

the ultimately nonlethal nature of Cuatlacuatl's injuries and his ability to walk to a nearby hospital were fortuitous; they are not facts that undermine the jury's conclusion.

### 3.    Premeditation

Scroggins also argues that "the evidence allowed for premeditation to commit several different responses [*sic*], of which killing was only one." Alternatively, he contends that there was insufficient evidence to support the inference that he acted with premeditation and deliberation. We reject both contentions.

Our Supreme Court has identified three broad categories of evidence sufficient to sustain a finding of premeditation and deliberation. (See *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).) They are "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than "mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Ibid.*) Notably, "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive." (*People v. Pride* (1992) 3 Cal.4th 195, 247; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 663-664.)

We disagree with Scroggins that none of the *Anderson* factors is present here. To the contrary, all of them are. The evidence reasonably indicated planning activity; specifically, prior to the attempted murder, Scroggins armed himself with a knife for a morning trip to the grocery store. He waited until Mateo engaged Cuatlacuatl in a

16

fistfight before pulling the knife and using it to stab Cuatlacuatl. Although Scroggins had no prior personal relationship with Cuatlacuatl in particular, the evidence showed that Scroggins and Cuatlacuatl belonged to rival gangs and were aware of their divergent allegiances at the time of the stabbing. Villafana testified that gang members have incentives to commit violent crimes, and that a gang member who stood idly by during an attack on a rival would be perceived as weak. A jury reasonably could conclude from this evidence that Scroggins had a motive to kill Cuatlcuatl and considered his options before attempting to do so. The manner of Scroggins's attack on Cuatlacuatl – multiple stab wounds to the neck, while Cuatlacuatl was occupied with defending himself against Mateo's blows – also supports the jury's finding that Scroggins acted with premeditation and deliberation.

In short, ample evidence supported the jury's finding there was no reasonable doubt that Scroggins acted with premeditation and deliberation. Moreover, we presume the jury followed CALCRIM No. 224 and the court's other instructions in arriving at this conclusion. (*People v. Carey* (2007) 41 Cal.4th 109, 130.) We affirm Scroggins's conviction for lack of sufficient evidence.

### B. Prosecutorial Error

Scroggins argues that the prosecutor "muddied the water" and committed reversible error during closing argument by "suggesting that the law required the jury to consider *only* whether the evidence was sufficient to support the elements of attempted murder, which, of course, included having the intent to kill." He points specifically to the prosecutor's statement that "A person convicted of murder has also committed an assault. [The court] just read you the assault and I showed you the assault instructions. [¶] So my point is this when counsel stands up and says he is guilty of one crime you can be guilty of multiple crimes, ladies and gentlemen. The charge here for you to consider is attempted murder." Scroggins further contends this argument and other similar statements by the prosecutor misstated the law because a person may be guilty of murder without necessarily being guilty of assault or attempted murder.

17

### 1. Forfeiture

Respondent contends Scroggins's assertions of prosecutorial error are forfeited because he failed to object on the basis of prosecutorial error below. To preserve a claim of prosecutorial error or misconduct for appeal, "a defendant must make a timely and specific objection to the alleged misconduct and request the jury be admonished to disregard it." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1339.) Scroggins satisfied that requirement here as to his contention that the prosecutor misstated the law. He objected, twice, that the prosecutor misstated the law by asserting that someone who commits murder also is guilty of attempted murder. The court overruled his objections, but, by making them, Scroggins preserved his appellate argument.

We agree, however, that Scroggins forfeited his contention that the prosecutor erred by telling the jury that the "charge here for you to consider is attempted murder." Scroggins did not object to this comment on any basis and therefore may not do so now. In any event, the prosecutor's comment was correct and in no way misleading.[5] The only charge before the jury in fact was attempted murder; the information did not allege either defendant committed assault or any other crimes. No reasonable juror would have, or indeed could have, interpreted the prosecutor's true statement to that effect as "reducing the burden on the prosecutor to prove the intent element of attempted murder beyond a reasonable doubt."

### 2. Analysis

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements." (*People v. Hill* (1998) 17 Cal.4th 800, 829.) A misstatement of the law does not necessarily require reversal, however. "[A] prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution

---

[5] We note that Scroggins's counsel made similar statements during her closing argument. She argued, "there is only one crime that's charged here. One crime attempted murder." She also argued that Scroggins was at most guilty of the uncharged crime of assault rather than the charged crime of attempted murder.

18

when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]" (*People v. Coffman* (2004) 34 Cal.4th 1, 119.)  Conduct that does not render the trial fundamentally unfair violates California law only if it involves the use of  deceptive or reprehensible methods to attempt to persuade the jury or court.  (*Ibid.*)

Scroggins contends the prosecutor misstated the law because "a person convicted of murder is not necessarily guilty of attempted murder, such as where the murder is a felony murder."  We need not decide whether Scroggins is correct because he has not demonstrated that he was in any way prejudiced by the prosecutor's assertions that individuals who murder a victim necessarily attempted to do so and assaulted the victim as well.  The prosecutor's comments, even if inaccurate, did not infect the trial with unfairness or deprive Scroggins of due process; nor were they reprehensible.  They were responsive to Scroggins's arguments that he was at most guilty of assault rather than the charged crime of attempted murder and did not, as Scroggins suggests, lighten the prosecution's burden of proof.  Moreover, the court instructed the jury that it had to "follow the law as I explain it to you, even if you disagree with it.  If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  We presume the jury followed this instruction.  (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

WILLHITE, Acting P. J.                                    MANELLA, J.

19