Filed 12/4/18

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C084180 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F07264) |
| v. | |
| SHAUNA MARIE BURTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Matthew J. Gary, Judge. Affirmed.

Diane L. Nichols, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, II, and IV.

1

A jury found defendant Shauna Marie Burton guilty of two counts of first degree murder and one count of second degree robbery, found true a multiple-murder special circumstance, and found true allegations that defendant used two deadly weapons (a flashlight and a knife).  (Pen. Code, §§ 187, 190.2, subd. (a)(3), 211, 12022, subd. (b)(1).)  The trial court sentenced defendant to prison for life without parole plus seven years, and defendant timely filed this appeal.

Defendant contends the trial court improperly admitted evidence about a prior conviction, no substantial evidence supports first degree murder, and the court misinstructed on the use of willfully false prior statements.  We shall affirm.

## BACKGROUND

There is no serious dispute about whether defendant robbed a pharmacy cashier one morning and later that day killed the elderly victims, Melvin and Jean Bain (hereafter Melvin and Jean) in their trailer.  A witness saw defendant go into the trailer to get some pain pills and then heard screaming from the trailer, including defendant saying someone owed her.  Bloody prescription bottles and pills were found on a bedroom floor.  After her arrest, defendant made many false statements to a detective.  At trial she testified Jean caught her and Melvin *in flagrante* and attacked her, whereupon she defended herself with a flashlight and fled, leaving both victims alive.  The jury did not believe her.

A. *Trial Evidence*

At about 7 a.m. on November 3, 2013, defendant tried to buy condoms at a CVS pharmacy in Rancho Cordova and then (unsuccessfully) tried to rob the cashier by telling her she had a gun.  She then left the pharmacy in a red Cadillac with a white top.  The store manager recorded the Cadillac's license plate.

Brice Vaughn testified he had been "semi" dating defendant.  In early November 2013 he had the Cadillac, although it was registered to his father.  On the evening of November 2, 2013, defendant stayed overnight at his house.  The next morning his parents called him about his Cadillac, which was gone.  When he called defendant about

2

his car, she told him she was having it worked on. The couple had not been cohabiting at that time.

Vaughn also testified that he had dated defendant for over two years, but in July 2013 she cut him with a box-cutter, she was prosecuted for that act, and they broke up.[1] When defendant arrived at his house on November 2, 2013, that was the first time he had seen her since she had cut him.

An officer sent to a Rancho Cordova mobile home park before noon found Melvin dead and Jean alive but unresponsive. A bloody Maglite flashlight and bloody kitchen knife were found, and a telephone cord had been cut. Two bloody prescription bottles and some loose pills were found on a bedroom floor. A Cadillac found at a nearby apartment complex matched the description of the car seen leaving the pharmacy robbery.

Melvin, aged 78, died of stab wounds to his neck and chest, but also had blunt force head injuries consistent with having been inflicted by a Maglite flashlight. He also had defensive wounds. Jean, also aged 78, died in the hospital 10 days later. She died of blunt force trauma, five or six blows to the head consistent with having been inflicted by a Maglite flashlight. She also suffered a stab wound just below the neck and had defensive injuries. Several of her ribs were broken, possibly by someone stomping on her.

Patrick Vanorman lived in an apartment across the street from the mobile home park. He had known defendant for four years and had previously obtained pain pills from her. That mid-morning she came by and asked him to go across the street with her to get him some pain pills, and he agreed. They drove over in a Cadillac before noon. Defendant went into the mobile home and Vanorman stayed in the Cadillac. After about

---

[1] This testimony is the basis for the first claim of error on appeal, which we address in Part I of the Discussion, *post*.

10 or 15 minutes he left. While he had been waiting he heard screaming and arguing, including a man's voice saying, "get out" and "bitch" and defendant saying, "you owe [me] this bitch." When defendant looked outside Vanorman told her he was leaving. He also told her she could borrow $20 from him, and later ("a good hour, hour and a half") she returned to his apartment. She borrowed some clothes and was already wearing a different shirt.

Detective Brian Meux questioned defendant that evening while she was under arrest for car theft. She told him the Cadillac was at a stereo shop, but Meux knew it was actually at Vanorman's apartment complex. She claimed another woman had been driving the car. She denied going into the Bains' mobile home. She claimed Melvin gave her money. She said he was her best friend, "like family," but showed no emotion when told he was dead. During the five-hour interview, she never claimed self-defense.

Defendant (aged 36) testified she had been living with Vaughn for about three years. She testified she had known Melvin for about three years. Eventually their relationship became sexual, and he would either pay her or buy her things. Jean did not know about the affair, so far as defendant knew. That morning defendant went to buy condoms. She denied threatening the clerk and claimed she just walked out with the goods. Vanorman had called her the night before about pain pills, which she had given him in the past. She thought she could get some from Melvin, who had given her pills before; she also wanted to have sex for money.

Defendant testified that after Melvin told her he could not get her the pills, she told Vanorman to leave. Because Jean was asleep, she and Melvin went into the family room to have sex. Jean appeared and began screaming and hitting Melvin. In the kitchen, Jean began hitting him with a flashlight; defendant intervened, grabbed the flashlight from her and gave it to Melvin. Jean again began fighting with Melvin, defendant heard screaming, and she again separated the couple; at that point she saw a knife in Jean's hand. As Jean swung the knife, defendant hit her in the head two or three times with the

4

flashlight to defend herself. She did not remember pulling out the telephone cord. There was a lot of blood and she was scared, so she left. She thought Melvin was hurt and that she could be charged with something because she was covered with blood. She denied killing anybody or intending to kill anybody. She went to Vanorman's apartment to change her shirt. She only hit Jean in self-defense and she never touched the knife. She was scared because the Bains were White and she was Black and she thought the White officer questioning her (Detective Meux) would think she was guilty, so she lied to him.

On cross-examination she generally explained she had lied to the police so that she would not get into trouble. She admitted she did not tell Vaughn the Bains had been fighting and she had to defend herself, even though she considered Vaughn her boyfriend. She never told Meux anything about the Bains fighting. She did not call for help for Melvin (who was bleeding), although he was someone she cared about, and she had told Meux he was her best buddy in the world.

Defendant admitted she was convicted of felony domestic violence, with Vaughn as the victim. She agreed that Vaughn testified they broke up in July 2013 when she attacked him but denied that this was so. She insisted she still lived with Vaughn.

In rebuttal, an officer testified that based on blood spatter patterns, he believed Jean was sitting in a chair when she was attacked.

B. *Closing Arguments*

The People argued defendant at first only intended to get pills and money, but when Melvin refused to cooperate, she made a deliberate decision to kill him. A "blink of an eye" or "fraction of a second" was enough time; "A cold, calculated choice can be arrived at quickly. And that's exactly what happened in this case." Defendant was a liar. She first told Detective Meux she was not there (refuted by her DNA), then claimed self-defense (belied by the severity of the injuries, including defensive wounds), then claimed the Bains killed each other (which made no sense). It made no sense that defendant had to hit Jean (a smaller and much older woman) multiple times with a flashlight to stop an

5

attack, or that after being hit repeatedly by a flashlight Jean would continue the attack. It made no sense to claim that Melvin could have killed his wife when he was found beaten to death as well. Defendant claimed Melvin had been her good friend, but she displayed no remorse. Defendant had a prior conviction evidencing moral turpitude. The prosecutor referenced defendant's admission to lying and the instruction allowing the jury to "consider that" in determining guilt and then listed many of the lies defendant testified she had told Meux.

Defense counsel argued Vanorman offered defendant money for pills that she thought she could get from Melvin. Vanorman was just outside the trailer while defendant was inside. Melvin did not die instantly, and Jean did not die in the trailer but lived for a while after the attack, "so there's a lot of stuff [Jean] could have done after somebody leaves the house." Merely beating someone does not show premeditation. Defendant lied because she was a Black prostitute being interrogated by a White detective, after she had been in a house with two "at least wounded" White people, so her fear was natural.

In rebuttal, the prosecutor invited the jury to consider what defendant did before, during and after the killings. Before the killings defendant chose a heavy Maglite because she wanted to kill the elderly and vulnerable victims after she had quickly made her "cold, calculated decision." During the killings defendant repeatedly attacked vital regions of each victim's body (head and neck). Defendant attacked Jean (who was sitting in a chair) to eliminate a witness. After the killings, defendant hid the Cadillac and lied many times.

The jury took only 80 minutes to return verdicts of guilt.

6

# DISCUSSION

## I

### *Evidence Underlying the Prior Conviction*

Defendant contends Vaughn's testimony about defendant stabbing him several months before the killings should have been excluded. We agree the evidence was admitted in error but find no prejudice.

A. *Background*

Before jury selection, the prosecutor sought to introduce one of defendant's prior offenses, a 2013 felony charge of domestic violence (Pen. Code, § 273.5) with Vaughn as the victim. Defense counsel argued the evidence was unduly prejudicial, as the charged offenses included violence against a person pertaining to "domestic matters," the details of the prior incident did not speak to credibility, and they would portray defendant as a habitual criminal. The trial court granted the motion and the parties then agreed to sanitize the prior so that the jury would be told only that it was a felony of moral turpitude reflecting on honesty; without objection, the court treated this as a stipulation.

After defense counsel finished cross-examining Vaughn, the prosecutor argued the questions "opened the door" to admission of the details of defendant's prior conviction. The prosecutor argued that because defense counsel had asked many questions pertaining to the couple's relationship and Vaughn's unemployment, he had implied Vaughn was defendant's pimp and therefore the defense had opened the door "to the prior domestic incident that happened in July of 2013, which was just a few months before this."

After a lengthy discussion regarding the details and relevance of the relationship between defendant and Vaughn, the trial court allowed the evidence recited above, that in July 2013 defendant had cut him with a box-cutter, she was prosecuted for that act, and they broke up.

When that evidence was presented, the trial court immediately admonished the jury the evidence was to be considered only for credibility: "That is to say, you may have

7

evidence where [Vaughn] testified that they didn't sleep together or have sex or the type of the relationship they had." "The testimony was allowed only to gauge the credibility of the testimony and the witnesses. It is not admitted at all for the purpose of what we call propensity. You cannot consider it, for example" to mean that if defendant cut Vaughn in July "she probably committed" the instant charged crimes. "You can consider it just to determine potentially the credibility of the two stories." The jurors indicated they understood. The court twice told the jury the parties had spent 40 minutes discussing the issue.

B. *Analysis*

Defendant questions the viability of an "opening the door" theory to admit otherwise inadmissible evidence. (See *People v. Morrison* (2011) 199 Cal.App.4th 158, 165, fn. 4 ["The notion that such a rule exists has been labeled a ' "popular fallacy" ' and rejected by courts and commentators"].) Defendant also argues that if such a theory *is* viable, defense counsel's questions of Vaughn did not make admissible the details of the prior that the parties had stipulated to keep out, because questions are not evidence. She adds the evidence should have been excluded under Evidence Code section 352.

We agree with defendant that trial counsel's questions or insinuations were not evidence and therefore there was no basis for the trial court to disregard the stipulation; therefore, we need not address defendant's two other contentions.

As construed by the trial court without objection, the parties stipulated to keep the details of the prior conviction out. During defense counsel's cross-examination of Vaughn, no *evidence* came out that changed the circumstances known at the time of the stipulation. During the protracted colloquy with counsel outside the jury's presence, the trial court pointed to *insinuations* from questions trial counsel asked Vaughn. For example, the court noted that defense counsel had asked questions about sex and had adopted a skeptical or "scoffing" tone towards Vaughn. Later, the court opined that "the violence comes in because the sex opens up the nature of the relationship that you're

8

trying to establish" both via questioning and at an in-chambers discussion where he suggested defendant was a prostitute and Vaughn was her pimp.

But as the jury in this case was instructed (CALCRIM No. 222), nothing an attorney says or suggests in court is evidence (apart from stipulated facts) and an attorney's "questions are significant only if they helped you to understand the witnesses' answers." Cocounsel made this exact point during colloquy and defendant raises it on appeal, but the Attorney General never responds to it.

We have explained that a stipulation is a solemn agreement that can be set aside only for good cause. (See *County of Sacramento v. Workers' Comp. Appeals Bd*. (2000) 77 Cal.App.4th 1114, 1118-1119; *Bowden v. Green* (1982) 128 Cal.App.3d 65, 72 [" 'A stipulation in proper form is binding upon the parties' "].) "A court is free to disregard a stipulation *only* if it is 'illegal' or 'contrary to public policy.' [Citations.]" (*Estate of Burson* (1975) 51 Cal.App.3d 300, 306, italics added; see 1 Witkin, Cal. Procedure (5th ed. 2008) Attorneys, § 264.) Because the factual matrix had not changed during defense counsel's cross-examination of Vaughn (given that questions and insinuations are not evidence) there was no reason to discard the stipulation. The fact that it then may have been perceived as inconvenient or even unfair for the People was not sufficient. (See *County of Sacramento*, *supra*, 77 Cal.App.4th at p. 1121 ["a poor outcome is not a principled reason to set aside a stipulation"]; *Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279.) By way of contrast, if defendant had later testified "I have never stabbed anyone," that would have constituted testimonial *evidence* and arguably may have justified setting the stipulation aside. But that did not happen. Defense counsel merely asked questions; Vaughn did not contradict himself about his relationship with defendant. This was an effort to lock Vaughn into certain testimony, so defense counsel could try to elicit contrary testimony from defendant and thereby hope to cause the jury to disbelieve Vaughn or at least have a doubt about his version of events. But

9

Vaughn was being questioned during the People's case-in-chief and, again, nothing in his *responses* to defense counsel's questions justified setting the stipulation aside.

The Attorney General in part argues that because defense counsel had signaled an attack on Vaughn's credibility, the prosecutor was entitled to introduce evidence to bolster it. (See *People v. Merriman* (2014) 60 Cal.4th 1, 75 ["the defense had begun to lay the groundwork"]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1085 ["a trial court has discretion . . . to permit the prosecution to introduce evidence supporting a witness's credibility on direct examination, particularly when the prosecution reasonably anticipates a defense attack on the credibility of that witness"].) But that does not justify *disregarding the stipulation* regarding this *particular* evidence.

Further, as cocounsel pointed out during the colloquy, because Vaughn admitted he let defendant spend the night, evidence of the stabbing was not particularly probative on the issue of credibility (of either Vaughn or defendant) or even on the issue of the "nature of the relationship" as the trial court mused; it was ambiguous because it did not cause Vaughn to refuse to let her sleep over, and in any event Vaughn's credibility was a relatively minor issue in the case.

We find the trial court's ruling admitting the facts underlying the prior conviction was made in error because there was no basis to disregard the stipulation.

C. *Prejudice*

Defendant's view that the evidence deprived her of a fair trial or violated due process is incorrect. The error was an ordinary state-law evidentiary error on a relatively minor point, and was harmless. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

10

Most importantly, the evidence was both brief and mild. Two questions established that several months before the killings defendant cut Vaughn, he pressed charges, and she was prosecuted. Further questions showed that this caused the couple to break up and Vaughn had not seen defendant since the incident. Vaughn did not testify about the nature of the incident (whether it was a full-blown fight, whether it was unprovoked, etc.) nor to any pain, disfigurement, or medical treatment. Defendant was asked briefly about the incident and denied that she broke up with Vaughn over it. None of this testimony was inflammatory either in itself or particularly in comparison to the evidence of the charged killings, which included bloody photographs of the scene and the victims. Therefore, this evidence was not likely to evoke any bias against defendant. (See *People v. Karis* (1988) 46 Cal.3d 612, 638.)

The fact the jury knew defendant had been prosecuted for the prior offense lessened any potential prejudice. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1245.)

The trial court admonished the jury immediately after the testimony about its limited purpose and emphasized it was not to be used as propensity evidence. The fact the court told the jurors the discussions lasted 40 minutes as the court exercised its function as the "keeper of the law" in ruling on the evidence was not prejudicial, as defendant asserts. It explained to the jurors that the trial had been delayed by a legal matter that needed to be resolved, rather than leaving the jurors in the dark. In addition to the contemporaneous instruction, at the end of trial the court instructed the jury that "certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." We presume these admonitions were obeyed. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [jurors are "presumed to have followed the court's instructions"].)

The prosecutor did not dwell on this evidence in argument. He commented on the importance of the *prior conviction* as a tool to measure credibility, but only briefly referred to "domestic violence," in one passage explaining that "the domestic violence

11

conviction was a crime of moral turpitude." Defendant's implicit view that the details of the conviction were key to the prosecutor's argument is not supported by the record. Nor was there any effort to use the evidence to imply defendant had a propensity to violence generally or specifically for using knives, which defendant characterizes "the elephant in the room."

The evidence that defendant killed the Bains was overwhelming. The suggestion that they killed each other was not supported by other evidence and defied logic. It is true there was a question as to degree, which we discuss in Part II, *post*. But evidence that defendant cut Vaughn and was prosecuted for it before the charged crimes did not speak to that issue clearly (if at all). For these reasons the evidentiary error was not prejudicial. (See Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

II

*Premeditation and Deliberation*

Defendant contends there is no substantial evidence of premeditation and deliberation. The Attorney General disagrees but concedes that the evidence of first degree murder is "hardly overwhelming." Indeed, the prosecutor only briefly touched on the point, arguing defendant's calculated decision to kill was reached quickly once Melvin refused her request for drugs and money. However, we find sufficient evidence of premeditation and deliberation.

A. *Legal Standards*

When reviewing a claim of insufficient evidence, we must view the evidence and all reasonable inferences in the light most favorably to the verdicts. (See *People v. Abilez* (2007) 41 Cal.4th 472, 504.)

We recently summarized the rules about reviewing a record for substantial evidence of premeditation and deliberation as follows:

12

" ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.  [Citations.] "The process of premeditation and deliberation does not require any extended period of time.  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .'  [Citations.]"  [Citation.]' [Citation.]

"Our Supreme Court has established guidelines for our review, as follows:

" 'The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).

" 'Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).' (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27, original italics.)

"The above passage did not change the definition of murder or establish elements that had to be proven in each case; it established 'guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation.'  [Citation.]  'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.'  [Citations.]  Or as we have phrased it before, the factors do not impose 'a straightjacket on the manner in which premeditation can be proven adequately at trial.'  [Citation.]  (*People v. Williams* (2018) 23 Cal.App.5th 396, 409-410 (*Williams*).)

13

B. *Analysis*

We will presume the jury accepted the prosecutor's view that defendant entered the Bains' trailer to obtain pain pills and get money, and not with any intention to kill.

But viewing the evidence in the light most favorably to the verdict, when Melvin told defendant to leave, she got mad and decided to kill him to take what she wanted, reflecting both anger and greed. (See *People v. Jackson* (1989) 49 Cal.3d 1170, 1200 [even unreasonable anger is a sufficient motive].) She then attacked Jean--a much older and smaller woman--to eliminate a witness. (See *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118 ["the elimination of a percipient witness is motivation enough in the premeditation and deliberation context"].) Thus, there is evidence of motives as to each victim, greed and anger (Melvin) and elimination of a witness (Jean).

From the way defendant killed her victims the jury could infer a deliberate, preconceived, intention to kill. Defendant knew the victims were elderly and she was 36 at the time of the killings, from which the jury could infer neither victim posed a threat to her. But she used two deadly weapons on each victim, a heavy flashlight and a kitchen knife (albeit apparently not weapons she brought with her to the scene). She attacked the head and neck areas of her victims. In a recent case we found sufficient evidence of first degree murder in part based on manner evidence: "There is also evidence of the intentional and deliberate manner of killing: two neck stabs, with an implied interval to reflect, as well as the infliction of blunt force trauma in different areas of the victim's body. [Citations.]" (*Williams*, *supra*, 23 Cal.App.5th at p. 410; see *People v. Steele, supra,* 27 Cal.4th at p. 1250 [use of two methods, stabbing and strangling, supported premeditation and deliberation].) The facts here reflect similar manner evidence. Further, defensive wounds and multiple blows to vital organs can support an inference " 'that the blows were intended to kill rather than merely wound.' [Citation.]" (*Williams*, *supra*, 23 Cal.App.5th at p. 411; see also *People v. Lewis* (2009) 46 Cal.4th 1255, 1293 ["the additional act of slashing her throat 'is indicative of a reasoned decision to kill' "].)

14

Defendant then rummaged the trailer for drugs, as shown by the pills and bloody prescription bottles on the bedroom floor, and changed her clothes, which the jury could find was inconsistent with the commission of a rash killing. Our Supreme Court considered an analogous fact pattern and reasoned as follows: "[T]he conduct of defendant *after* the stabbing, such as the search of dresser drawers, jewelry boxes, kitchen drawers and the changing of a Band-Aid on his bloody hand, would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing. Here, defendant did not immediately flee the scene." (*People v. Perez* (1992) 2 Cal.4th 1117, 1128.) The jury could draw similar inferences from the evidence in this case.

After leaving the Bains bleeding in the trailer, defendant did not call for help but instead changed her clothes and later lied to Vaughn about where the Cadillac was; she also told many lies to Detective Meux. Her lies and change of clothes evidenced her consciousness of guilt, which need not be construed as pertaining to the least available crime. (See *Williams*, *supra*, 23 Cal.App.5th at p. 411 ["the jury did not have to conclude defendant's consciousness of guilt pertained only to a lesser offense, but instead could find defendant knew he had killed the victim and had desired that outcome. Defendant abandoned his van, prepared to flee to Oklahoma, and gave a false name when arrested weeks later. That postkilling conduct, as well as the implication from the People's case-in-chief that defendant did nothing to help the victim after he stabbed her, speaks volumes as to his mental state"].) Defendant's postkilling conduct in this case is equally telling as in *Williams*.

Although a jury might have found defendant acted out of some rash or panicked impulse, a rational jury could find defendant guilty of first degree murder.

Defendant misinterprets a passage of *People v. Nazeri*, *supra*, 187 Cal.App.4th 1101. Defendant contends *Nazeri* held that a killing with multiple stabbings is consistent with a berserk attack, not premeditation and deliberation. This misreads the case, as we recently explained as follows:

15

"The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk, attack, as suggested by defendant's briefing. But it was permitted to find otherwise. A case discussing manner evidence, repeatedly cited by defendant's briefing, cuts against his position. The case [*Nazeri*] (quoted more fully than reflected in the briefing) provides as follows:

" 'Manner of killing is the least strong of the *Anderson* categories as the case comes to us. *The manner of killing here—stabbing two victims more than two times each, including around the face, the neck and lungs—is, at least in a vacuum, associated with someone losing his mind and going berserk, which is not a state of mind we associate with premeditation or deliberation.* We note an irony here: The more genteel the form of dispatch, the more readily premeditation may be inferred. Vicious brutal knifings, particularly when the victim is awake and fighting back, tend to fall on the opposite side of the spectrum from, say, the administration of arsenic in a guest's tea. That said, our Supreme Court *has* . . . upheld a first degree murder conviction in a vicious knife attack no less gruesome than the ones here.

" ' [¶]. . . [¶]'

"Defense counsel repeatedly relies on the italicized sentence of *Nazeri*, which muses academically about whether such manner of killing necessarily reflects deliberation and premeditation. But the *holding* of the case is that the manner of killing described *did* manifest those mental states. Read in context, this passage of *Nazeri* supports the conclusion that the manner of killing here shows premeditation and deliberation." (*Williams*, *supra*, 23 Cal.App.5th at pp. 410-411.)

As in *Williams* (and *Nazeri*), the jury might have found defendant committed a senseless frenzied attack, without deliberation or premeditation. But the jury was not compelled to interpret the evidence that way. Instead, it could find that by using two different lethal weapons and by attacking each victim's head and neck, and by leaving the victims without obtaining aid for them, defendant acted with deliberation and premeditation. As our Supreme Court has said: "A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation. [Citation.]" (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

16

Accordingly, viewing the facts in the light most favorably to the verdicts, sufficient evidence supports the first degree murder verdicts.

III

*CALCRIM No. 362*

The parties agreed on all instructions, and in part the trial court gave the jury the pattern instruction on false statements, CALCRIM No. 362, as follows:

> "If the defendant made a false or misleading statement before this trial relating *to the charged crime*, knowing the statement was false or intending to mislead, that conduct may show she was aware of her guilt of *the crime* and you may consider it in determining her guilt.

> "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." (Italics added.)

Based on the italicized references to "the crime" and "the charged crime," defendant contends this instruction improperly undermines any claim that defendant may have felt a consciousness of guilt of a lesser offense than first degree murder and therefore created a presumption of guilt of the charged crimes. She notes in contrast that the analogous CALJIC instruction provided that deliberately false statements could be used "to prove a consciousness of guilt" (CALJIC No. 2.03) which avoids the problem by not restricting the awareness of guilt to "charged" offenses.

"Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

Defendant's argument makes sense academically, but only if one focuses on certain words in this instruction and on this instruction itself rather than the whole body of instructions. In theory, as defendant points out, there is a distinction between generalized consciousness of wrongdoing and consciousness of guilt of the specific

17

crimes charged. But we are not persuaded that a jury would interpret CALCRIM No. 362 to preclude an appropriate defense argument about consciousness of guilt.

First, we must explain CALJIC No. 2.03: "CALCRIM No. 362 is the successor to CALJIC No. 2.03, which provided as follows: 'If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime or crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.' " (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103.) We have held that the differences between the two instructions are "minor." (*Id*. at p. 1104.)

In *People v. Crandall* (1988) 46 Cal.3d 833 (*Crandall*), our Supreme Court considered a claim that CALJIC No. 2.03 allowed a jury to treat "consciousness of guilt" as tantamount to a confession. In rejecting this claim *Crandall* stated:

> "Defendant's fear that the jury might have confused the psychological and legal meanings of 'guilt' is unwarranted. A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*Crandall*, *supra*, 46 Cal.3d at p. 871.)

In a subsequent case our Supreme Court characterized this passage as holding a jury would understand the phrase "consciousness of guilt" "to mean only 'consciousness of some wrongdoing,' not consciousness of each and every element of the charged offense. [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 142.)

18

Defendant's view is that by so construing CALJIC No. 2.03, the Supreme Court avoided the very problem posed in this case, but by using different language without this protection CALCRIM No. 362 improperly guided the jury toward first degree murder.

We are not persuaded.

We must consider the instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions. (See *People v. Cain* (1995) 10 Cal.4th 1, 36; *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.)

Here, the court instructed the jury it had to determine "what specific crime was committed" if any, and instructed the jury on second degree murder (including that the People had to prove first degree murder by showing premeditation, etc.), voluntary manslaughter (including that the People had to prove a lack of a sudden quarrel or provocation, and self-defense (including that the People had to prove defendant did not act in self-defense).

In considering all of the instructions given, the jury would understand that any consciousness of guilt evidenced by defendant's multiple lies to Detective Meux would operate as to any degree of homicide, not merely first degree murder. After all, "The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.) And at the time defendant was speaking to Meux, she could not have known what she *later* would or might be charged with. Few people understand the intricacies of California law pertaining to homicide (e.g., manslaughter vs. murder, second degree vs. first degree murder, justifiable homicide, etc.), and when a person feels some guilt about having done something wrong, fine points of law would not come into play.

Further, CALCRIM No. 362 *limits* the reach of any adverse inference both by telling the jury that it decides the "meaning and importance" of the evidence and by

19

telling the jury the making of a willfully false statement "cannot prove guilt by itself." (CALCRIM No. 362.) CALCRIM No. 362, like CALJIC No. 2.03 before it, is designed to benefit the defense, " 'admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.' [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 908.) And because the evidence cannot prove guilt by itself, a jury would understand that the consciousness of guilt--however deep it ran--was not the equivalent of a confession. (See *Crandell*, *supra*, 46 Cal.3d at p. 871.) Thus, a jury would understand both that false statements were not the equivalent of a confession and that they were not themselves sufficient to prove guilt of the charged crimes. "The trial court properly left it for the jury to determine whether defendant's statement to police was false or deliberately misleading, and if so, what weight should be given to that evidence." (*People v. McGowan*, *supra*, 160 Cal.App.4th at p. 1104.)

Accordingly, we reject the claim that CALCRIM No. 362 as drafted is infirm.[2] If defendant wanted an instruction to clarify this point, "it was incumbent upon [her] to request it." (*Crandell*, *supra*, 46 Cal.3d at pp. 870-871.)

IV

*Cumulative Error*

Defendant also argues cumulative error. We have found only one error, the admission of certain evidence, and we found that error to be harmless. (See Part I, *ante*.) We do not have multiple errors that might cumulate to show prejudice.

---

[2] That does not mean the instruction could not be improved. Other CALCRIM instructions regarding consciousness of guilt speak of facts from which it may be inferred a defendant was "aware of (his/her) guilt" generally, without any possible suggestion that the inference is limited to guilt of the crime(s) charged, such as the instructions on suppression or fabrication of evidence (CALCRIM No. 371) and flight (CALCRIM No. 372) that were given to the jury in this case. Similarly, CALCRIM No. 362 could be amended to refer to consciousness of guilt without referencing the charged crime (as CALJIC No. 2.03 did and as CALCRIM Nos. 371 and 372 do) and avoid the issue.

## DISPOSITION

The judgment is affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Blease, Acting P. J.

_____/s/_____
Butz, J.